Robert SIMPSON, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, et al., Respondents.

No. 86–1441.

United States Court of Appeals, District of Columbia Circuit.

Argued March 20, 1987.

Decided March 18, 1988.

D.C., were on the brief for respondent, Roy Dan Jackson.

L. Joseph Ferrara, Atty., Federal Mine Safety and Health Review Com'n, Washington, D.C., entered an appearance, for respondent, Federal Mine Safety and Health Review Com'n.

Ann Rosenthal, Counsel, Appellate Litigation, and Vicki P. Shteir–Dunn, Atty., Dept. of Labor, Washington, D.C., were on the brief for amicus curiae, Secretary of Labor, urging reversal of the Federal Mine Safety and Health Review Com'n decision.

Before RUTH BADER GINSBURG and WILLIAMS, Circuit Judges, and McGOWAN,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case concerns the protection afforded by the Federal Mine Safety and Health Act, 30 U.S.C. §§ 801 *et seq.* (Mine Act), to miners who refuse to work because of hazardous conditions. Robert Simpson claims that the operators of the Black Joe Mine responded to a protected work refusal on his part by constructively discharging him and later refusing to reinstate him, all in violation of section 105(c)(1) of the Mine Act, 30 U.S.C. § 815(c)(1). An administrative law judge (ALJ) upheld Simpson's complaint against the operators,[1] but the Federal Mine Safety and Health Review Commission (FMSHRC or Commission) reversed the ALJ's decision.

The Commission held that when Simpson left the Black Joe Mine, he was not protected by the Mine Act because he failed to communicate the reasons for his work refusal to the mine operator. Even if Simpson's work refusal attracted the Act's

Tony Oppegard, with whom Stephen A. Sanders was on the brief, for petitioner.

David T. Smorodin, with whom Peter A. Greene and Steven D. Cundra, Washington,

---

* Judge McGowan was a member of the panel but did not participate in this decision.

1. The ALJ's fact findings, when supported by substantial evidence, are conclusive under the Mine Act. *See* 30 U.S.C. § 815(a)(1). In the background section that follows, we rely dominantly on the ALJ's recitation of facts, as reported in Simpson v. Kenta Energy, Inc., 6 FMSHRC 1454, 1455–59 (1982). Except as specifically noted, neither the Commission nor the mine operator now challenges the ALJ's fact determinations.

protection, the Commission continued, the mine operators did not constructively discharge or otherwise discriminate against him. The constructive discharge standard announced by the Commission, however, appears to be inconsistent with the safety-forcing, miner-protective tenor of the Mine Act. Furthermore, we do not comprehend the Commission's reasons for holding that Simpson should not be excused from the communication requirement. We therefore reverse the Commission's order and remand the case for further proceedings consistent with this opinion.

## I.

Petitioner Robert Simpson worked for 20 months in 1981 and 1982 at the Black Joe Mine in Harlan County, Kentucky, a facility operated by Roy Dan Jackson and the Kenta Energy Company. Employed as a scoop operator, Simpson left his job on September 21, 1982. Coal was extracted from the Black Joe Mine by cutting, drilling, and blasting an underground vein or "seam"; the loose coal was then gathered through the use of a scoop and hauled from the working area or "face" of the mine to a conveyor belt. Until his departure, Simpson performed his assigned work without any adverse comment or evaluation from the mine operators.

During most of Simpson's service at the Black Joe Mine, his foreman was Danny Noe, whose responsibilities included the preshift and onshift safety inspections required by the Mine Act and implementing regulations. See 30 U.S.C. § 863(d) & (e); 30 C.F.R. §§ 75.303, 75.304. Under these same provisions, preshift inspections are to be recorded in the mine office by the employee performing them. 30 U.S.C. § 863(d); 30 C.F.R. § 75.303. It was Danny Noe's practice, however, to report inspections by telephone to another employee, Charlie Patterson, who would enter the inspection, signing Noe's name, in the record book. Patterson was the mine's "outside man"; he worked aboveground, ordering needed parts and transmitting requests for equipment from the mine site to the mine office.

Noe left his post as foreman on September 3, 1982, apparently because of an injury, and from that day until some time after Simpson's departure no foreman or other supervisor attended to operations at the Black Joe Mine. Despite Noe's absence, Charlie Patterson continued to record inspections, routinely signing Noe's name in the inspection book, but neither the preshift nor the onshift safety inspections were actually performed. During this same period the mine headings, which previously had advanced along a straight path from the mine entrance, turned to the right.

This development worried Simpson and other members of his crew, for they knew from the mine map that they were at that point working in the direction of an "old works" or abandoned mine. Abandoned mines often contain accumulations of methane, water, or "black damp" (oxygen deficient air); if the advancing mine face were to pierce the old works, the miners would be exposed to the risk of explosion, drowning, or suffocation. Because of these dangers, the Mine Act and FMSHRC regulations require that test holes be bored before any work is started on a mine face within 200 feet of an abandoned mine when the abandoned mine itself cannot be inspected. 30 U.S.C. § 877(b); 30 C.F.R. § 75.1701. The Black Joe Mine headings had advanced 200 to 250 feet toward the old works by September 21. For want of a workable auger barrel at the mine, however, the crew was unable to drill the required test holes. Previously, Simpson and at least two other members of his crew had asked Charlie Patterson to get a test auger, citing the dangers that might lie in the old works, but no auger came until after September 21.

With no safeguard against the hazards confronting workers at the Black Joe Mine, and no supervisor to perform the required preshift and onshift inspections, Simpson decided not to return to work after the end of his shift on September 20, 1982. Two days later, when Simpson returned to the mine in the middle of a shift to collect his belongings, Charlie Patterson offered to

put him back on the payroll and to pay him for a full day if he would resume work immediately. Simpson asked if there was either a boss or a test auger at the mine. When Patterson replied that there was no boss and no auger on site, Simpson responded that "it still wouldn't help me none."

Simpson, when he left his job, did not notify foreman Noe, mine operator Jackson, or anyone else in authority, of the reasons for his refusal to continue working at the Black Joe Mine. Simpson knew that Jackson's home was within a few miles of his own, yet Simpson apparently made no attempt to communicate with Jackson until December 1982. Simpson then told Jackson that he had left work in September because there was at that time no boss and no test auger at the mine. Having heard through a member of the crew that the mine now had both, Simpson asked Jackson for his job back. Jackson refused, saying he had no openings. Jackson also warned Simpson, "[n]ext time you'll learn not to get a wild hair."

Simpson thereupon filed a complaint with the FMSHRC, alleging that Jackson and Kenta Energy had discriminated against him in violation of section 105(c)(1) of the Mine Act, 30 U.S.C. § 815(c)(1).[2] Complaint, Joint Appendix (J.A.) iii. Section 105(c)(1) prohibits mine operators from dis-

criminating against miners for asserting rights conferred by the Mine Act, including, in the Commission's view, the right to refuse to work in conditions the miner reasonably and in good faith believes to be hazardous. *See Miller v. Federal Mine Safety & Health Review Commission*, 687 F.2d 194, 195–96 (7th Cir.1982); *Secretary on behalf of Robinette v. United Castle Coal Co.*, 3 FMSHRC 803 (1981). After an investigation by the Mine Safety and Health Administration, the Secretary of Labor declined to prosecute and Simpson pursued the claim through private counsel.[3]

After a hearing, the ALJ concluded that Simpson had "quit work in good faith because of concerns for his safety," and that Simpson's safety concerns were reasonable. *Simpson v. Kenta Energy, Inc.*, 6 FMSHRC 1454, 1460 (1984). The ALJ therefore held that Simpson's work refusal was protected by the Mine Act. *Id.* The Commission ordinarily requires those asserting Mine Act protection to communicate their reasons for a work refusal to the operator. Citing Commission precedent, the ALJ observed that this communication requirement is not critical when notice to the operator would be futile. *Id.* at 1460–61; *see Secretary on behalf of Dunmire & Estle v. Northern Coal Co.*, 4 FMSHRC 126, 133 (1982). Jackson was aware of the

**2.** Section 105(c)(1) provides, in pertinent part:

(c) Discrimination or interference prohibited; complaint; investigation; determination; hearing

(1) No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, or because such miner, representative of miners or applicant for employment is the subject of medical evaluations and potential transfer under a standard published pursuant to section 811 of this title or because such miner, representa-

tive of miners or applicant for employment has instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter.

30 U.S.C. § 815(c)(1).

**3.** *See* Letter to Robert Simpson from Ronald J. Schell, Joint Appendix (J.A.) iv. Complaints of discrimination under the Mine Act initially are investigated by the Secretary of Labor, through the Mine Safety and Health Administration. 30 U.S.C. § 815(c)(2). If the Secretary does not find that a violation of the Mine Act has occurred, the complainant may initiate proceedings before the Commission in his or her own behalf. 30 U.S.C. § 815(c)(3). The complaint may then be heard by an administrative law judge; Commission review of administrative law judge decisions is discretionary. 30 U.S.C. § 823(d).

hazardous conditions at the Black Joe Mine that prompted Simpson's work refusal, the ALJ said, and further notice by Simpson would have been futile as that term is comprehended by the Commission. 6 FMSHRC at 1460–61.

The ALJ next held that Simpson had been constructively discharged for his protected activity, and that this discharge constituted unlawful discrimination under section 105(c)(1). Guided by decisions of this and other circuits under comparable antidiscrimination statutes, the ALJ reasoned that a constructive discharge under the Mine Act occurs when conditions are so intolerable that a reasonable miner would feel compelled to resign. Even if Jackson and Kenta Energy did not specifically intend that Simpson should quit, the ALJ stated, they had notice of and were responsible for the deplorable safety conditions at the Black Joe Mine, and those conditions would have led a reasonable miner in Simpson's position to quit. 6 FMSHRC at 1460–61. The ALJ also held that Jackson's refusal to rehire Simpson constituted a second act of unlawful discrimination. 6 FMSHRC at 1462. Accordingly, the ALJ awarded Simpson requested relief, including reinstatement, backpay, and attorney's fees. After an additional hearing, the ALJ held Jackson personally liable for the award. *Simpson v. Kenta Energy Co.*, 7 FMSHRC 272, 286 (1985).

Jackson, but not Kenta Energy, sought review by the Commission, which reversed the ALJ's decision and dismissed the complaint. *Simpson v. Kenta Energy Inc.*, 8 FMSHRC 1034 (1986). The Commission agreed that conditions at the Black Joe Mine presented "blatant violations of the Mine Act," 8 FMSHRC at 1038, but disagreed with the ALJ regarding the consequences of Simpson's failure to notify the mine operator when Simpson stopped working. The Commission said it could not "simply presume that [giving notice to the

operator] would have been futile." 8 FMSHRC at 1039. The notice requirement may be excused only in "exceptional circumstances," the Commission observed; standing alone, "possible operator awareness of a hazardous condition," the Commission declared, does not suffice to support a finding of futility. 8 FMSHRC at 1039–40. Because Jackson might have responded to Simpson's concerns had they been communicated, the Commission concluded, Simpson's work refusal was unprotected by the Mine Act.

While acknowledging case law support for the constructive discharge analysis adopted by the ALJ and endorsed by the Secretary of Labor,[4] the Commission announced a more restrictive standard: it held that retaliatory motive must be shown in order to make out a claim of discriminatory discharge under the Mine Act. To meet this subjective standard, a miner asserting constructive discharge must prove that the operator created intolerable conditions with the specific intention of forcing the miner to quit. Even if Simpson had engaged in protected activity, the Commission said, the requisite demonstration of intent had not been made. 8 FMSHRC at 1040–41.

In a footnote, the Commission also reversed the ALJ's determination that Kenta Energy and Jackson engaged in a separate act of unlawful discrimination by refusing to rehire Simpson. The Commission said, with no further explanation, that this determination had "insufficient record support." 8 FMSHRC at 1041 n. 4. Finally, the Commission addressed Simpson's motion to reopen the proceedings to determine if the Black Joe Coal Company, as a legal successor to Kenta Energy, should assume liability for the ALJ's judgment against Kenta Energy. Although Kenta Energy, unlike Jackson, had not petitioned for review of the ALJ's decision, the Commission ruled that, there being "no violation of the Act,

---

4. The Secretary of Labor participated in this case before the Commission, and as an amicus curiae before this court, in support of the constructive discharge standard urged by Simpson and adopted by the ALJ. The Secretary has taken no position on whether substantial evi-

dence in the record supports the ALJ's fact findings, Brief for Amicus Curiae at 7 n. 6, and has declined to address the ALJ's treatment of Simpson's failure expressly to notify his employer of the reasons for his work refusal. *Id.* at 11 n. 7.

there is no liability on behalf of any respondent. In these circumstances, Simpson's argument that he has a binding judgment against Kenta because Kenta did not separately seek review is rejected." 8 FMSHRC at 1041. The Commission thus denied Simpson's motion, essentially to substitute Black Joe Coal Company for Kenta Energy, by vacating, on its own motion, Simpson's judgment against Kenta. In this petition for review, Simpson asks that we reverse the Commission's decision and approve the ALJ's rulings.

## II.

We note, initially, that this case raises for the court novel issues of Mine Act interpretation. We therefore recite at the start of our analysis now familiar guidelines. Our first endeavor "is to try to determine Congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect." *NLRB v. United Food & Commercial Workers Union, Local 23,* — U.S. —, 108 S.Ct. 413, 421, 98 L.Ed. 2d 429 (1987) (quoting *INS v. Cardoza–Fonseca,* — U.S. —, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)).

Where the Mine Act is "silent or ambiguous with respect to the specific issue," *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), we generally need ask only whether the FMSHRC's interpretation is "rational and consistent with the statute," *United Food & Commercial Workers,* 108 S.Ct. at 421, according deference to "reasonably defensible" constructions of the Mine Act by the Commission. *See Boich v. FMSHRC,* 704 F.2d 275, 280 (6th Cir.1983). Our deference to the FMSHRC is diminished, however, when the Secretary of Labor favors an interpretation at odds with that adopted by the Commission. *See Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir.1986); *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1552 (D.C.Cir.1984).

### A. *The Work Refusal*

█ According to Commission precedent, the Mine Act protects the right to refuse work under conditions that a miner reasonably and in good faith believes to be hazardous. *Secretary on behalf of Bush v. Union Carbide Corp.,* 5 FMSHRC 993 (1983); *Secretary on behalf of Robinette v. United Castle Coal Co.,* 3 FMSHRC 803 (1981). The Mine Act does not state this right explicitly, but the legislative history of the statute unequivocally supports the Commission's view. Most notably, the Senate report on the Act states that "[t]he Committee intends the scope of protected activities to be broadly interpreted ... and intends it to include ... the refusal to work in conditions which are believed to be unsafe or unhealthful." S.Rep. No. 181, 95th Cong., 1st Sess. 35 (1977), U.S.Code Cong. & Admin.News 1977, 3401, 3435 (Sen. Report), *reprinted in* Legislative History of the Federal Mine Safety and Health Act of 1977 (Leg. Hist.) 623 (1978). Sponsors of the Mine Act reiterated this understanding during debate on the Senate floor; they ranked as "essential," "the right to refuse work under conditions that a miner believes in good faith to threaten his health and safety." 123 Cong.Rec. 20043, 95th Cong., 1st Sess. (June 21, 1977) (Sen. Williams), Leg. Hist. at 1089. *See generally Miller v. FMSHRC,* 687 F.2d 194, 195 (7th Cir.1982) ("so clear a statement in the principal committee report is powerful evidence of legislative purpose").

This evidence warrants our approbation of the work refusal doctrine, even if Congress' intent is "imperfectly expressed in the statutory language." *Id.; see generally INS v. Cardoza–Fonseca,* — U.S. —, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). Circuits that previously have reached the issue are in accord, *e.g., Consolidation Coal Co. v. FMSHRC,* 795 F.2d 364 (4th Cir.1986) (listing cases), and further support may be found in this court's construction of the mine safety law that preceded the Mine Act. *See Munsey v. Morton,* 507 F.2d 1202 (D.C.Cir.1974); *see also* Sen. Report at 36, U.S.Code Cong. & Admin.News 1977, 3436, Leg. Hist. at 644 (list of protected rights "intended to be illustrative and not exclusive.").

■ Simpson's claim concerns the particulars of the miner's work refusal right, for the right itself, as we have just developed, is beyond genuine debate. As a corollary to the requirement that miners exercise the right in good faith, based on an objectively reasonable fear of hazard, the Commission has set forth one further requirement:

Where reasonably possible, a miner refusing work should ordinarily communicate, or at least attempt to communicate, to some representative of the operator his belief in the safety or health hazard at issue. "Reasonable possibility" may be lacking where, for example, a representative of the operator is not present, or exigent circumstances require swift reaction. We also have used the word "ordinarily" in our formulation to indicate that even where such communication is reasonably possible, unusual circumstances—such as futility—may excuse a failure to communicate.

*Secretary on behalf of Dunmire & Estle v. Northern Coal Co.,* 4 FMSHRC 126, 133 (1982). While this requirement is not planted in the language or history of the Mine Act, it is certainly "rational and consistent with the statute," *United Food & Commercial Workers,* 108 S.Ct. at 421, and we therefore accept this qualified communication requirement as part of a reasonable interpretation of the Mine Act by the Commission.

The communication requirement serves the Mine Act in three critical ways. The requirement promotes safety, as the Commission has said, because prompt notice of a hazard "may permit the operator to correct the condition in a timely fashion and may protect others in the mine from harm." *Northern Coal,* 4 FMSHRC at 133. Furthermore, a reasonably perceived danger may, in time or upon investigation, prove nonexistent, in which case communication affords the operator a chance to allay worker fears and thus prevent an interruption in mine production. The requirement also serves an evidentiary function: the Commission believes that "the practical effect of this rule will be to assist in weeding out work refusals infected by bad faith." *Id.* at 134. As the Seventh Circuit has pointed out, "[o]nly a monster would walk off the job without taking immediate steps to protect the workers who remained," *Miller,* 687 F.2d at 196, so it is fair to assume that those miners who notify an operator about an imminent hazard are more likely to be sincere than those who do not.

■ It is not Simpson's sincerity, however, that is at issue; despite Simpson's failure expressly to communicate his concerns to the operator, no one disputes the ALJ's finding that Simpson acted in good faith and that his concerns for his safety were reasonable. No representative of the operator was present to allay his fears, and Simpson surely was not a "monster" who left work without regard for his fellow miners: he had made his concerns unmistakably clear to his entire crew, and to Charlie Patterson. Hearing Transcript (Tr.) at 41–48, J.A. at 11–17; 6 FMSHRC at 1456–57, 1462. With no supervisor on the job, Simpson appears to have taken the only "immediate" steps he could have taken to safeguard others. Nonetheless, as communication with a supervisor (Jackson) was a "reasonable possibility," there remains the issue on which the ALJ and the Commission were at odds: whether Simpson should be excused from meeting the requirement because notice would have been futile. *Cf. Miller,* 687 F.2d at 196 (need for notice not a precondition to the communication requirement).

Noting the Commission's announced intention to "evaluate communication issues in a common sense, not legalistic, manner," *Northern Coal,* 4 FMSHRC at 134, Simpson maintains that the ALJ properly invoked the futility exception in his case. Simpson argues that the ALJ's finding of futility was supported by substantial evidence, so that the Commission, when it rejected the ALJ's determination, impermissibly substituted its own view of the facts for that of the ALJ, a substitution prohibited by the Mine Act.[5] Jackson an-

---

5. The Commission may review an ALJ's deci-

sion only on one or more of five specified

swers that the "futility" issue is one of law rather than fact, calling for "precisely the sort of legal determination properly within the Commission's scope of review." Respondent's Brief at 19.

The Commission's decision sheds little light on this aspect of the dispute. In reversing the ALJ, the Commission stated:

The record clearly indicates that Simpson made no reasonable attempt to communicate his concerns to Jackson. We cannot simply presume that such communication would have been futile.... Even assuming, as the [ALJ] did, that Jackson was aware of the absence of a foreman and the failure to conduct the required pre-shift and on-shift examinations, we cannot presume that Jackson would have taken no action had Simpson communicated his concerns to Jackson.

Possible operator awareness of a hazardous condition does not mean that upon complaint by a miner an operator will continue to ignore its duty to correct the hazard.

8 FMSHRC at 1039–40. We cannot tell from this cryptic statement whether the Commission meant to reject the legal standard applied by the ALJ, or, alternatively, whether the Commission simply regarded the ALJ's finding of futility as a fact determination that lacked adequate record support.

If we follow the Commission's direction that the communication requirement be administered in a "common sense" manner, a "futility" conclusion should adhere so long as there is substantial evidence to support an ALJ's determination that an operator would not have responded to notice of a hazard. In this case, that would mean record support for the ALJ's prediction that if Simpson had communicated his fears to Jackson, Jackson would not have

remedied conditions at the Black Joe Mine or otherwise have assuaged Simpson's fears. In this light, the Commission's decision could be read to maintain that there was substantial evidence only for a finding of "possible operator awareness of a hazard," *id.*, and not for the conclusion that notice would have been futile.

The ALJ had ample record support, however, for finding not only that Jackson was aware of conditions at the mine but also that he would have been unresponsive to any worker complaints about them. Jackson himself said flatly that he would have provided a test auger only "when I felt like," "to keep from getting a notice," or to avoid a delay caused by a "nit-picky" inspector, and that he would not have provided one in response to miners' request. Tr. at 323–29, J.A. at 78–80. One could rationally determine from this testimony that Jackson was aware of conditions at the mine, including the absence of a foreman and consequent failures to conduct safety inspections, and would not have responded to further, more formal, or more explicit notice. *See id.; see also* J.A. at 137–39 (excerpts from Roy Dan Jackson's deposition). Finally, Jackson's evident disdain for worker complaints supports a conclusion that he would not have offered any reassurance to the miners in response to concerns about the old works. *See* J.A. at 137–38 (Jackson deposition).

Jackson maintains that "[i]f Simpson had complied with the Act's reporting requirements, he would have learned that his concerns regarding the old works were groundless." Respondent's Brief at 19. Jackson could have offered such reassurance, however, only if he had inspected the old works. The ALJ did not resolve the dispute in the record as to whether he had

grounds:

(I) A finding or conclusion of material fact is not supported by substantial evidence.

(II) A necessary legal conclusion is erroneous.

(III) The decision is contrary to law or to the duly promulgated rules or decisions of the Commission.

(IV) A substantial question of law, policy or discretion is involved.

(V) A prejudicial error or [sic] procedure was committed.

30 U.S.C. § 823(d)(2)(A)(ii) (1982). *See Donovan v. Phelps Dodge Corp.,* 709 F.2d 86, 90 (D.C. Cir.1983) ("the Commission is statutorily bound to uphold an ALJ's factual determinations that are supported by substantial evidence").

done so. 6 FMSHRC at 1456. There was record evidence, we note, that the old works could not be inspected. Tr. at 189, J.A. at 50. Simpson's concerns about the want of supervision and proper inspection at the Black Joe Mine, moreover, could not have been dispelled as "groundless."

These arguments, it appears to us, simply rehearse the factual dispute that was before the ALJ; therefore, they should not deflect this panel. The Mine Act denies the Commission (and, on judicial review, this court) authority to overturn an ALJ's fact determinations, even those involving predictions about operator conduct, when those determinations are supported by substantial evidence. *See Donovan v. Phelps Dodge Corp.*, 709 F.2d 86, 90–91 & nn. 6, 7 (D.C.Cir.1983) (McGowan, J.).[6] The ALJ had adequate support for his finding of futility, and cannot properly be reversed for "presuming" futility solely on the basis of "possible operator awareness."

Because of the manner in which the ALJ cast his decision, the Commission may have blended or confused the facts one could reasonably find from the record with the legal framework for evaluating those facts. Immediately after the finding of futility, the ALJ added a suggestion unnecessary to the adjudication of Simpson's case: the ALJ opined that the communication requirement may be excused whenever "the operator was aware of the hazardous conditions which prompted the refusal." 6 FMSHRC at 1462. This juxtaposition of fact finding and broad dictum was unfortunate. The Commission's understandable rejection of the dictum, however, does not justify its overturning the discrete, and differently premised, fact finding of futility.

We therefore remand the communication issue to the Commission for reconsideration, and for a clear explanation of why the futility exception should or should not apply to the facts of this case. The Commission's decision may reflect an unarticulated conclusion that, as a matter of law, futility in this context requires some showing beyond what the term means in common parlance, a showing Simpson may not have made. If so, the Commission must state its premise comprehensibly and explain coherently why Simpson's work refusal was not protected. Any such endeavor, of course, must satisfy the bedrock requirement that it comport with a reasonable construction of the Mine Act.

## B. *Constructive Discharge*

■ Simpson next challenges the Commission's rejection of the ALJ's conclusion that Jackson and Kenta Energy constructively discharged him. All parties apparently agree that if the work refusal was protected, a constructive discharge would have amounted to unlawful discrimination within the meaning of section 105(c)(1) of the Mine Act, 30 U.S.C. § 815(c)((1).[7] The dispute is one of proof: what standard must a Mine Act complainant satisfy to prevail on a constructive discharge claim?

Constructive discharge doctrines simply extend liability to employers who indirectly effect a discharge that would have been forbidden by statute if done directly. The ALJ reasoned that a constructive discharge occurs whenever a miner engaged in protected activity can show that an operator created or maintained conditions so intolerable that a reasonable miner would have felt compelled to resign. 6 FMSHRC at 1460–61. This objective standard is the one we employ in cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq. See Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981).[8] The same test

---

6. *Donovan*, we note, also involved an ALJ's prediction about an operator's response to specific circumstances, *i.e.*, whether an employee would have been discharged in the absence of protected activity. 709 F.2d at 90–91. Predicting futility is, by nature, little different.

7. The operator has not argued that this is a case of "mixed motive," or that the discharge would have taken place in the absence of the work refusal. *Cf. Donovan v. Stafford Construction Co.*, 732 F.2d 954, 958–59 (D.C.Cir.1984).

8. *See also Lopez v. S.B. Thomas Inc.*, 831 F.2d 1184 (2d Cir.1987) (42 U.S.C. § 1981); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307 (5th Cir.1987) (Title VII); *Young v. National Center for Health Servs. Research*, 828 F.2d 235 (4th Cir.1987) (same); *Watson v. Nationwide Ins. Co.*, 823 F.2d 360 (9th Cir.1987) (same);

also is employed in adjudicating constructive discharge claims under other statutes that protect employees exercising statutory rights from adverse job action.[9]

The standard applied by the ALJ, although in wide use, was rejected by the Commission. The FMSHRC recognized the "blatant violations of the Mine Act" at the Black Joe Mine, 8 FMSHRC at 1038, and assumed for analytical purposes that Simpson's work refusal had been protected. *Id.* at 1040. Nevertheless, the Commission overturned the ALJ's finding of constructive discharge because "no evidence in this record [showed] that Jackson or Kenta were motivated to create or maintain the conditions" in order to force Simpson to quit. *Id.* Under the subjective standard announced by the Commission, a miner must prove that an operator imposed intolerable working conditions with the specific intent of retaliating for protected activity. According to the Commission, a constructive discharge claim like Simpson's must fail absent proof that the operator harbored a retaliatory motive. The FMSHRC acknowledged that decisions under other employment discrimination statutes reject this subjective test and adopt, instead, the analysis used by the ALJ; in a Delphic pronouncement, however, the Commission dismissed cases under other statutes as inapposite and stated that "section 105 of the Mine Act is essentially an anti-retaliation provision." *Id.*

Simpson, joined by the Secretary of Labor, asserts that the Commission's proof standard is incompatible with the broad remedial purpose of the Mine Act. Congress' paramount concern for miner safety, in their view, is ill-served by requiring miners to prove operator motivation. *See* 30 U.S.C. § 801(a) (declares miner safety "the first priority and concern"). Jackson answers, essentially, that we should defer to Commission's standard as a reasonable construction of the Mine Act, a position that finds some support in decisions of the two federal circuits in which the subjective constructive discharge analysis persist. *See Yates v. AVCO Corp.,* 819 F.2d 630 (6th Cir.1987) (Title VII); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981) (same). Jackson's brief also features selected passages from *Clark,* 665 F.2d 1168, which suggest that employer intention is relevant to the constructive discharge doctrine this circuit employs under Title VII. Respondent's Brief at 25. *But see Hopkins v. Price Waterhouse Inc.,* 825 F.2d 458, 472 (D.C.Cir.1987) (majority and dissent approve objective constructive discharge standard).

In *Clark,* however, we expressly rejected a motivation test identical to the one adopted by the Commission, noting that "an employer's subjective intent is irrelevant" to the issue of constructive discharge. 665 F.2d at 1175 & n. 8. In light of the acceptance of an objective constructive discharge standard in Title VII cases, *id.,* the predominance of this standard across a range of remedial antidiscrimination statutes, *see supra* notes 8 and 9, and the Secretary of Labor's support for the ALJ's reasoning, Brief for Amicus Curiae at 11–12, the Commission cannot defend its decision simply by invoking the court's general obligation to defer to reasonable agency interpretations of their organic statutes. *Mead Johnson Pharmaceutical Group v. Bowen,* 838 F.2d 1332, 1335 (D.C.Cir.1988). We have previously noted that Congress intended the Secretary of Labor's construction of the Mine Act to be accorded respect by both the Commission and the courts; that instruction has led us to endorse the Secretary's construction of the Mine Act when it is more com-

---

*Derr v. Gulf Oil Corp.,* 796 F.2d 340 (10th Cir. 1986) (Title VII); *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885 (3d Cir.1984) (same); *Parrett v. City of Connersville,* 737 F.2d 690 (7th Cir.1984) (42 U.S.C. § 1983); *Rosado v. Santiago,* 562 F.2d 114 (1st Cir.1977) (Title VII).

*Contra, Yates v. AVCO Corp.,* 819 F.2d 630 (6th Cir.1987) (Title VII); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981) (same).

9. *See, e.g., Ford v. Alfaro,* 785 F.2d 835 (9th Cir.1986) (Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)); *Buckley v. Hospital Corp. of America,* 758 F.2d 1525 (11th Cir.1985) (Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34).

patible with the statutory purpose. *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C.Cir.1986); *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1552 (D.C.Cir.1984).

The Commission's severely restrictive interpretation ultimately requires, therefore, some evidence in the language or history of the Mine Act suggesting that Congress conceived the protection conferred by section 105(c)(1) to be narrower than that afforded under Title VII or comparable antidiscrimination laws. No such evidence appears. To the contrary, by adopting section 105(c)(1), Congress expanded the class of persons and the scope of activities protected by the mine safety laws. *Compare* 30 U.S.C. § 815(c)(1) (1982), *with* the provision it replaced, 30 U.S.C. § 820(b)(1) (1976). *See Donovan v. Stafford Constr. Co.*, 732 F.2d 954, 959–60 (D.C.Cir.1984) (section 105(c)(1) must be broadly interpreted). The Senate report stressed that the antidiscrimination section should be read "expansively to assure that miners will not be inhibited in any way from exercising any rights afforded by this legislation," SEN. REPORT at 36, U.S.Code Cong. & Admin.News 1977, 3436, LEG. HIST. at 624; the report further states the committee's view that "whenever protected activity is in any manner a contributing factor to the retaliatory conduct, a finding of discrimination should be made." *Id.*

The approach adopted by the Commission, we are persuaded, is not compatible with Congress' remedial purpose. We further believe that the objective standard set out in *Clark* is suitable in the Mine Act context. The Commission previously has been sensitive to the proof problems that confront Mine Act complainants;[10] the proof hurdle would become formidable, for many complainants, insurmountable, if a miner were required to establish subjective operator motivation. Evidence relevant to such motivation inevitably will be within the control of the operator. Imposing a subjective standard, we think it plain, would frustrate Congress' intent that min-

ers not be inhibited in the exercise of their rights.

An objective approach to constructive discharge claims works no unfairness on the operator. As we noted in *Clark*, the standard simply captures the legal commonplace that an employer " 'must be held to have intended those consequences it could reasonably have foreseen.' " 665 F.2d 1168, 1175 & n. 8, quoting *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980). Moreover, the requirement that conditions be "intolerable" to support a constructive discharge will not easily be met. Minor or technical violations of the Mine Act, or those that do not endanger health and safety, ordinarily will not support a finding of constructive discharge. Finally, we note an incongruity inherent in a contrary holding: intolerable "humiliation and loss of prestige" would support a finding of constructive discharge under one anti-discrimination statute, *Clark*, 665 F.2d at 1175, but a reasonably perceived peril to life and limb occasioned by "blatant violations of the Mine Act" would not support such a finding under the Mine Act. *Cf. Ford v. Alfaro*, 785 F.2d 835 (9th Cir.1986) (perceived threat of bodily harm amounted to constructive discharge under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)).

■ Whether conditions are so intolerable that a reasonable person would feel compelled to resign is a question for the trier of fact. *See, e.g., Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987). The Commission's reference to blatant safety violations seems to preclude rejection of the ALJ's finding on the basis of insufficient evidence. The resolution of this case, however, will turn on whether Simpson's work refusal was protected, so we remand the issue of constructive discharge for the Commission's disposition, should it reach the question, under the appropriate standard.

### C. *Remaining Issues*

■ Two additional challenges to the Commission's decision merit brief atten-

---

**10.** *See* Secretary on behalf of Robinette v. United Castle Coal Co., 3 FMSHRC 803, 811 (1981) (noting evidentiary problems as the basis for rejecting an "ascertainable evidence test" for evaluating work refusals, in favor of an objective reasonableness requirement).

tion. In a footnote, the Commission reversed the ALJ's determination that the refusal to rehire Simpson in December 1982 constituted a second act of unlawful discrimination. The Commission said only that it found "insufficient record support for this conclusion." 8 FMSHRC at 1041 n. 4. If Simpson's September work refusal was unprotected, the Commission's ruling would be sound, because the discrimination prohibited by the Mine Act requires some nexus to protected activity. The Commission will have to reconsider its ruling, however, if it finds that Simpson should have been excused from meeting the communication requirement. If Simpson's work refusal was protected by the Mine Act, the evidence—particularly Jackson's December warning to Simpson "not to get a wild hair"—would have supported the ALJ's finding that the refusal to rehire was based on protected activity, in violation of section 105(c)(1). *See generally Munsey*, 507 F.2d at 1211 (refusal to rehire may be act of discrimination if responsive to protected activity).

Simpson's final challenge is to the Commission's refusal to reopen the proceedings to determine whether the Black Joe Coal Company, as a legal successor to Kenta Energy, should assume Kenta Energy's liability to Simpson. On the basis of its other conclusions, the Commission held that "there is no liability on behalf of any respondent"; it thereupon vacated Simpson's judgment against Kenta Energy, even though Kenta Energy had not sought review of the ALJ's decision. 8 FMSHRC at 1041.

The Commission's return to the merits of Simpson's case obviously may compel a return to this last holding, so we note at this point only the questionable consistency of the Commission's action vacating the judgment against Kenta Energy with its review authority. *See supra* note 5; 30 U.S.C. § 823(d) (limiting the grounds for discretionary review by the Commission, and denying authority to "raise or consider additional issues" not presented by the petition for review).

CONCLUSION

For the reasons stated, we grant Simpson's petition for review, reverse the Commission's decision, and remand the case to the Commission with an instruction to reconsider whether Simpson's work refusal was protected, and if it was, for analysis of Simpson's constructive discharge and refusal to rehire claims in a manner consistent with this opinion. The Commission should also revisit its decision vacating, on its own motion, the judgment against Kenta Energy.

*It is so ordered.*