888 F.2d 1448
 281 U.S.App.D.C. 251, 1989 O.S.H.D. (CCH) P 28,721
 SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION,
on Behalf of Bobby G. KEENE, Petitioner
v.
Tolbert P. MULLINS, Prestige Coal Company, Inc., and Federal
Mine Safety and Health Review Commission, Respondents.
 No. 88-1765.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 22, 1989.
Decided Nov. 3, 1989.
 
 Jerald S. Feingold, Atty., Dept. of Labor, with whom Dennis D. Clark, Counsel, Dept. of Labor, was on the brief, for petitioner. George R. Salem, Solicitor, Dept. of Labor, also entered an appearance, for petitioner.
 Daniel R. Bieger, Atty., for respondents, Tolbert P. Mulins and Prestige Coal Co., Inc.
 L. Joseph Ferrara, Gen. Counsel, Federal Mine Safety and Health Review Com'n, also entered an appearance, for respondent, Federal Mine Safety and Health Review Com'n.
 Before WALD, Chief Judge, and BUCKLEY and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 The Secretary of Labor, Mine Safety and Health Administration ("MSHA" or "Secretary"), on behalf of Bobby G. Keene, petitions for review of two of three holdings in a decision by the Mine Safety and Health Review Commission ("MSHRC" or "Commission").[1] First, the Secretary seeks review of the Commission's holding that since S & M had already been found liable under Sec. 105(c) for unlawfully discharging Keene for complaining of illegal and hazardous working conditions, Keene could not also recover under Sec. 105(c) for Tolbert Mullins'[2] subsequent offer to reemploy him under the same illegal and hazardous working conditions because that offer was merely an outgrowth of S & M's prior unlawful discharge and not a separate violation of the Act. The Secretary also seeks review of the Commission's holding that Prestige is not a successor-in-interest to S & M and therefore is not jointly and severally liable to Keene for S & M's discriminatory discharge.
 
 
 2
 Because the Commission misinterpreted the law in holding that Mullins' conditional offer to reemploy Keene was part and parcel of Keene's original unlawful discharge and thus did not constitute a separately actionable violation of Sec. 105(c), we reverse its ruling on the reemployment issue. We affirm the Commission's conclusion, however, that Prestige is not a successor-in-interest to S & M and therefore is not jointly and severally liable to Keene for the original violation.
 
 I. BACKGROUND[3]
 
 3
 On February 13, 1986, Keene was dismissed from his job as an electrician and maintenance foreman with S & M for refusing to "bridge-out." Bridging-out is the practice of rewiring electrical equipment in order to bypass the equipment's disconnecting devices, thereby rendering the safety features ineffective. The next day, Keene filed a complaint with the MSHA alleging that he was discriminatorily discharged in violation of Sec. 105(c) of the Mine Act.[4]
 
 
 4
 Keene subsequently phoned Mullins to try and settle the dispute. After failing to agree on a monetary settlement, Mullins asked Keene to return to his job. In response,, Keene explained that he would not return to his old position because he did not want to be "responsible for the [electrical] examination books and conditions that everybody was bridging-out inside the mines." J.A. 61. Keene further testified that when he requested a second-shift job operating a shuttle car, Mullins replied that only Keene's original job on the day shift was available and that he could not pay electrician's wages to someone not doing an electrician's job. Id. Mullins added that if Keene returned to his old job, he would not have to record everything he saw or found in the examination books.[5] Keene summed up the conversation as follows: "Mullins told me that I would have to come back to my original job under the original circumstances I was working under.... I told him that it was too big a hazard for me to come back as electrician on the day shift." J.A. 62-63.
 
 
 5
 In May of 1986, S & M shut down for economic reasons. Prestige commenced operations in November. While Mullins and his wife owned all of S & M, they own approximately 55% of Prestige.[6] Prestige's mine is located a mile and a half from S & M's mine and Prestige mines under its own coal lease. Prestige is a surface coal mining company while S & M mined underground. Consequently, Prestige employs different mining techniques and uses different types of machinery and equipment than did S & M. Finally, Prestige and S & M employ different supervisors at S & M and only two of Prestige's eight employees worked previously at S & M.
 
 
 6
 After a hearing, the Administrative Law Judge ("ALJ") found that Mullins was liable to Keene under Sec. 105(c) for conditioning his offer of reemployment to Keene upon Keene's willingness to engage in unlawful and hazardous activity. The ALJ also found that Prestige is a successor-in-interest to S & M and thus is jointly and severally liable for S & M's discriminatory discharge of Keene.
 
 
 7
 A majority of the Commission's panel reversed the ALJ on both rulings, explaining that the record is void of substantial evidence to support either of them.[7]
 
 II. ANALYSIS
 
 8
 The Secretary takes issue both with the Commission's legal conclusions regarding Mullins' offer of reemployment and with its legal and factual conclusions regarding Prestige's successorship liability.
 
 
 9
 The Secretary first contends that the Commission misinterpreted Sec. 105(c) when it concluded that Mullins' offer to rehire Keene under illegal and unsafe conditions did not constitute a violation of the Act separate from Keene's unlawful discharge for complaining of those same conditions.
 
 
 10
 The Secretary next contends that the Commission misinterpreted the law of successorship liability and that under the correct interpretation of the law, the record contains substantial evidence showing that Prestige is a successor-in-interest to S & M.
 
 
 11
 We will address each contention in turn.
 
 
 12
 A. Mullins' Conditional Offer of Reemployment to Keene
 
 
 13
 In its opinion, the Commission asserts that the facts compel it to overrule the ALJ's conclusion that Mullins transgressed Sec. 105(c) by refusing to rehire Keene except under illegal and unsafe conditions. Thus the Commission says that "substantial evidence does not support the ALJ's finding that Mullins ... unlawfully discriminated against Keene." J.A. 17 (emphasis added).
 
 
 14
 While the Commission's opinion is not a model of clarity, a careful reading of its discussion of the reemployment issue indicates that it overturned the ALJ on legal and not factual grounds:[8]
 
 
 15
 While this offer [of reemployment under the same circumstances] did not resolve Keene's safety concerns, neither did it suggest any additional adverse action against Keene by Mullins.... We find no evidence that would cause the conversation to be characterized as anything other than an attempt by Keene and Mullins, in his role as President of S & M, to settle the original discrimination complaint.... Thus we view this conversation as an outgrowth of the original illegal discharge by S & M and not as a separate act of discrimination by Mullins individually. Under these circumstances, we hold that Keene's testimony regarding the crucial aspects of the conversation does not support a finding by the judge of a separate act of discrimination by Mullins individually.
 
 J.A. 17 (emphasis added).[9]
 
 16
 The first clue that the Commission's analysis hinges on its view of the law and not on its view of the facts is that the Commission found precisely the same dispositive facts as did the ALJ--that Mullins offered Keene his old job back under the conditions that prevailed prior to his original discharge except that he would "not have to report" the violations he found. J.A. 31-32. The second clue is that while the Commission emphasizes the nexus between an unlawful discharge and a refusal to rehire, the ALJ did not even mention the relationship. Id. Thus we read the Commission's opinion as articulating the following legal rule: An offer to reemploy a miner under illegal and dangerous conditions does not constitute a violation of Sec. 105(c) of the Act separate from a prior unlawful discharge for refusing to work under the same illegal and dangerous conditions and thus cannot be charged as an additional violation of Sec. 105(c).
 
 
 17
 We agree with the Secretary that this rule mischaracterizes the law. Moreover, because the Secretary reads the Mine Act differently than does the Commission, we are not bound by Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to accord great deference to the Commission's interpretation of the Act.[10]
 
 
 18
 Mullins' offer to reemploy Keene under illegal and dangerous conditions transgresses the clear prohibition of Sec. 105(c) that "[n]o person shall ... interfere with the exercise of the statutory rights of any miner ...or applicant for employment because such miner or applicant for employment has [ ] made a complaint under or related to this chapter of an alleged danger or safety or health violation in a coal or other mine ..., or because of the exercise by such miner ... or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter." (Emphasis added.) Keene was an "applicant for employment" when Mullins conditioned his job offer on Keene's working under illegal and unsafe conditions. Clearly, Mullins would not have felt compelled to condition his offer on illegal terms if Keene had not, while still employed at S & M, "made a complaint of" the unsafe conditions to which the illegal practice of bridging-out gave rise. The fact that S & M also violated Sec. 105(c) at an earlier point in time by interfering with Keene's statutorily protected rights while he was still a miner within the meaning of the Act does not insulate Mullins from liability for subsequently interfering with Keene's statutorily protected rights in his capacity as an applicant for employment.
 
 
 19
 Moreover, our interpretation of the applicability of the Act to Mullins' discriminatory reemployment offer is supported by the Senate Report that preceded the Act. As the Report explains, Sec. 105(c) is to "be construed expansively to assure that miners will not be inhibited in any way in exercising rights afforded by legislation," including "the right to refuse work on conditions they believe to be unsafe or unhealthful." S.Rep. No. 95-181, 95th Cong., 1st Sess. 36 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3436 (emphasis added). That language speaks directly to the issue here, as Keene was offered reemployment only under conditions he believed to be unsafe. Additionally, the report states that "[i]t is the Committee's intention to protect miners against not only the common forms of discrimination ... [but also] against the more subtle forms of discrimination." Id. An offer of reemployment conditioned on a miner's willingness to work under dangerous conditions of which a miner has previously complained surely qualifies as a more subtle form of discrimination. Finally, while Sec. 105(c) does not explicitly protect miners against discriminatory offers of reemployment, the report explains that, "[t]he listing of protected rights contained in Sec. 105(c) is intended to be illustrative and not exclusive." Id.[11]
 
 
 20
 In addition to the Act and its legislative history, prior discussions by this court of both the Mine Act and its forerunner, the Coal Mine Health and Safety Act of 1969 ("CMHSA"), support our conclusion that an employer's unlawful discharge of a miner for complaining of illegal and unsafe working conditions and an employer's offer to rehire the miner under the same illegal and unsafe conditions constitute distinct violations and thus are separately actionable.
 
 
 21
 In Simpson, 842 F.2d 453, we reviewed a decision by the Commission in which it had reversed the ALJ's findings of both discriminatory discharge and discriminatory failure to rehire under Sec. 105(c). After explaining its contrary views of both the "futility exception" and constructive discharge, the court remanded to the Commission to redetermine, in a manner consistent with its opinion, whether Simpson had been unlawfully discharged. We explained, however, that if the Commission determined that Simpson had been unlawfully discharged, the refusal of Simpson's employer to rehire Simpson constituted a second act of unlawful discrimination: "If Simpson's work refusal was protected by the Mine Act, the evidence ... would have supported the ALJ's finding that the refusal to rehire was based on protected activity, in violation of section 105(c)(1)." Simpson, 842 F.2d at 464.
 
 
 22
 Similarly, in Munsey, 507 F.2d at 1209-10, this court remanded to the Commission with a special instruction to address the petitioner's claim of unlawful failure to rehire in addition to reconsidering petitioner's claim of unlawful discharge: "The Board addressed petitioner's grievance solely as a matter of dismissal from ongoing employment.... We note, however, that not only was there the dismissal on April 15, but also the company's refusals on that date and later on April 29 to reemploy petitioners after they had expressed their willingness and desire to return to work."[12]
 
 
 23
 Nonetheless, while our dicta in both Simpson and Morton lend support to our holding here, we do not need to adopt as expansive a reading of the Act as we suggested in those cases. In both Simpson and Morton, the respective refusals to reemploy the discharged miners were just that; unconditional refusals to reemploy. We are not called upon in this case to hold that a mere unconditional refusal to reemploy an unlawfully discharged miner constitutes a violation of Sec. 105(c) separate from the miner's original unlawful discharge. Rather, under the facts of this case, we hold only that where a miner is discharged for complaining of illegal and unsafe working conditions and is subsequently offered reemployment conditioned on his willingness to return to those same illegal and unsafe working conditions, the unlawful discharge and the discriminatory reemployment offer constitute separate violations of Sec. 105(c) and thus may be charged independently and simultaneously.[13] Consequently, we reverse this part of the Commission's holding and remand for further proceedings consistent with this opinion.[14]
 
 B. Prestige's Successorship Liability
 
 24
 While the Secretary's contention that the Commission misstated the law governing successorship liability is correct as an initial matter, the Commission did apply the correct legal test in the alternative.[15] As set out by the Commission, the "multiplicity of factors [relevant to the determination of] successorship in [ ] a labor context [include]":[16]
 
 
 25
 (1) Whether the successor company had notice of the charge, (2) the ability of the predecessor to provide relief, (3) whether there has been substantial continuity of business operations, (4) whether the new employer uses the same plant, (5) whether he uses the same or substantially the same work force, (6) whether he uses the same or substantially the same supervisory personnel, (7) whether the same jobs exist under substantially the same working conditions, (8) whether he uses the same machinery, equipment and methods of production and (9) whether he produces the same products....
 
 
 26
 J.A. 15.
 
 
 27
 The Secretary's contention that substantial evidence supports a finding of Prestige's successorship liability under the multifactor test merits little discussion.[17] Applying the test to the facts of this case, the Commission's contrary conclusion is clearly reasonable. The Commission found that:
 
 
 28
 Prestige's mine is a surface mining operation whereas S & M was an underground operation [factor 5]. Prestige's mine is located a mile and a half from S & M's mine and Prestige mines under a different coal lease [factor 4].... Only two of Prestige's eight employees were employed previously by S & M [factor 6].... [The two companies employ different supervisors, factor 7]. The machinery, equipment and mining methods of Prestige and S & M are not the same [factor 8]....
 
 
 29
 Because Sec. 823(d)(2)(C) of the Act vests the Commission with the authority to overturn ALJ factfindings that are not supported by substantial evidence, we affirm the Commission's finding that Prestige is not a successor-in-interest to S & M and therefore is not jointly and severally liable for S & M's unlawful discharge of Keene.
 
 III. CONCLUSION
 
 30
 The Mine Act, its legislative history and our cases demonstrate that discharging a miner for complaining of illegal and unsafe working conditions and conditioning an offer of reemployment to that miner on his willingness to work under the same illegal and unsafe conditions constitute distinct violations of Sec. 105(c) of the Act and thus are separately and simultaneously actionable. Consequently, we grant the Secretary's petition for review of the reemployment question, we reverse the Commission's decision on that issue, and we remand for further proceedings consistent with this opinion.
 
 
 31
 The Commission reasonably concluded, however, that Prestige is not a successor-in-interest to S & M and thus is not jointly and severally liable to Keene for S & M's unlawful discharge of Keene. We therefore affirm the Commission's ruling on the successorship liability question.
 
 
 32
 It is so ordered.
 
 
 
 [1]
 Neither the MSHA nor appellees Mullins and Prestige Coal Company ("Prestige") seek review of the Commission's conclusion that S & M Coal Company ("S & M") violated Sec. 105(c) of the Mine Safety and Health Act of 1977, 30 U.S.C. Secs. 801 et seq. ("Mine Act" or "Act") by discriminatorily discharging Bobby Keene, an electrician at S & M, for engaging in a protected work refusal
 
 
 [2]
 Mullins was S & M's owner and president
 
 
 [3]
 The facts recounted in the text that follows are taken from the Commission's decision. Joint Appendix ("J.A.") 8-11, 15
 
 
 [4]
 Section 105(c) provides in relevant part:
 No person shall discharge or in any manner discriminate against ... or otherwise interfere with the exercise of the statutory rights of any miner ... or applicant for employment ... because such miner ... has filed or made a complaint under or related to this Act, including a complaint notifying the operator or the operator's agent ... of an alleged danger or safety or health violation in a coal or other mine, ... or because of the exercise by such miner ... on behalf of himself or others of any statutory right afforded by this chapter.
 (Emphasis added).
 
 
 [5]
 We interpret this remark to mean, "if you come back, you should not report violations." A literal interpretation makes no sense because Keene wanted violations reported and corrected, hence his original discharge for refusing to "bridge-out."
 
 
 [6]
 The remaining interest is owned by three other unrelated individuals
 
 
 [7]
 Commissioner Lastowka dissented on both points
 
 
 [8]
 This is not the first time this court has had trouble distinguishing between the Commission's factual and legal conclusions. In Simpson v. FMSHRC, 842 F.2d 453, 460 (D.C.Cir.1988), this court could "not tell from this cryptic statement whether the Commission meant to reject the legal standard applied by the ALJ, or alternatively, whether the Commission simply regarded the ALJ's finding of futility as a fact determination that lacked adequate record support."
 
 
 [9]
 The Secretary contends, MSHA Brief at 16 n. 11, that since Mullins did not raise before the Commission the issue of whether he can be insulated from liability because his reemployment offer to Keene was made during a settlement discussion, the Commission did not have the authority to address the issue. The Secretary invokes the Mine Act in support of this argument, which expressly limits the Commission's authority to review an ALJ's decision to only those questions raised by a party in its petition for review, 30 U.S.C. Sec. 823(d)(2)(A)(iii), unless the Commission itself expressly identifies additional issues for review in accordance with the procedures set forth in 30 U.S.C. Sec. 823(d)(2)(B)
 We do not view the Commission's discussion of settlement negotiations as invocation of an "additional issue." Rather, the Commission characterized the conversation between Keene and Mullins as a settlement negotiation merely to highlight its belief that Mullins' offer of reemployment was part and parcel of Keene's original unlawful discharge and thus did not constitute a separate violation of Sec. 105(c). Clearly, the issue of whether Mullins' offer of reemployment violated Sec. 105(c) was in context.
 
 
 [10]
 As this court explained in Simpson:
 Where the Mine Act is "silent or ambiguous with respect to the specific issue," Chevron at 843, 104 S.Ct. at 2782, we generally need only ask whether the FMSHRC's interpretation is "rational and consistent with the statute," NLRB v. United Food & Commercial Workers, 484 U.S. 112, 108 S.Ct. 413 at 421, 98 L.Ed.2d 429 (1987), according deference to "reasonably defensible" constructions of the Mine Act by the Commission. See Boich v. FMSHRC, 704 F.2d 275, 280 (6th Cir.1983). Our deference to the FMSHRC is diminished, however, where the Secretary of Labor favors an interpretation at odds with that adopted by the Commission [citing cases].
 Simpson, 842 F.2d at 458.
 
 
 [11]
 Moreover, the report cites Munsey v. Morton, 507 F.2d 1202 (D.C.Cir.1974), discussed below, approvingly. In Munsey, we said that an employer could be held separately and simultaneously liable under Sec. 105(c) for both unlawfully discharging and refusing to rehire a miner
 
 
 [12]
 While Munsey arose under the CMHSA, the language of the section of the CMHSA at issue is nearly identical to that of Sec. 105(c). See Federal Coal Mine Health and Safety Act of 1969, Sec. 110(b)(1), 30 U.S.C. Sec. 820(b)(1). Moreover, the Mine Act was passed to expand the protections afforded miners under the CMHSA. S.Rep. No. 95-181, 95th Cong., 1st Sess. 35 (1977), U.S.Code Cong. & Admin.News 1977, p. 3435
 
 
 [13]
 While we understand that the settlement process should be encouraged by the law, "settlement negotiations" that would require the weaker party to accede to violations of the law do not fall within the protective ambit of that policy. As Commissioner Lastowka aptly explained in his dissenting opinion:
 Proper settlements cannot be conditioned on illegal terms. The practical impact, if any, of refusing to except settlement discussion from the reach of Sec. 105(c) is that proper settlements will go forward, improper settlements will not. That is as it should be.
 J.A. 21.
 
 
 [14]
 The Secretary argues, MSHA Brief at 19, that in addition to S & M, Mullins may be held individually liable for Keene's unlawful discharge. Since neither the ALJ nor the Commission discussed this argument, we do not address it
 
 
 [15]
 In its decision, the Commission states that "before the appropriateness of imposing liability can be resolved, it is necessary to first determine whether Prestige is even a successor.... For an employer to be considered a successor, there must be [either] a substantial continuity in the identity of the business enterprise before and after a change [or a transactional element between the predecessor and the alleged successor]." J.A. 14. The Commission then explains that "even if Prestige had occupied the status of successor, we would still conclude that it should not be held liable.... In determining whether a successor should be liable to remedy the unlawful discrimination of its predecessor, the Commission has followed the courts and has approved consideration of nine specific factors." J.A. 15
 We believe the Commission erred in applying one legal test for determining successorship and another for determining successorship liability, as the caselaw contemplates application of the nine-factor test, set forth in EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir.1974), for determining both successorship and successorship liability. Indeed, in Munsey v. Smitty Baker Coal Company, Inc., 2 F.M.S.H.R.C. 3463 (1980), aff'd in relevant part, Munsey v. Federal Mine Safety and Health Review Comm'n, 701 F.2d 976 (D.C.Cir.1983), cert. denied, Smitty Baker Coal Co. v. Federal Mine Safety and Health Review Comm'n, 464 U.S. 851, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983), the Commission itself expressly adopted this nine-factor test and applied it to determine both successorship and successorship liability.
 However, since the Commission applied the correct test in the alternative, J.A. 15, we cannot say that it misapplied the law.
 
 
 [16]
 MacMillan, 503 F.2d at 1094
 
 
 [17]
 The Secretary relies primarily on the ALJ's finding that under the nine-factor test, substantial evidence does support a finding of successorship liability. The Commission was correct, however, in rejecting the ALJ's conclusion as unreasonable. For example, the Commission dismissed the ALJ's finding that since Prestige, a company of eight employees, employed two former S & M employees, factor "five"--whether Prestige employs the same or substantially the same work force--was satisfied. Two out of eight can hardly be called "substantially the same." Similarly, the ALJ found that Monroe Nichols, S & M's former supervisor, is Prestige's supervisor, and thus factor "six"--"substantially the same supervisory personnel"--of the nine-factor test is satisfied. J.A. 32. Again, it was proper for the Commission to reject this finding. Mullins testified that Nichols was not a supervisor at Prestige and the record is barren of any assertion to the contrary. J.A. 15