SECRETARY OF LABOR, MINE SAFE-
TY AND HEALTH ADMINISTRA-
TION, on Behalf of John W. BUSH-
NELL, Petitioner,

v.

CANNELTON INDUSTRIES, INC., and
Federal Mine Safety and Health
Review Commission, Respondents.

No. 88–1229.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1988.

Decided Feb. 14, 1989.

Jeffrey A. Hennemuth, Attorney, U.S.
Dept. of Labor, with whom George R. Sa-
lem, Allen H. Feldman, and Steven J. Man-
del, Attorneys, U.S. Dept. of Labor, Wash-
ington, D.C., were on the brief, for petition-
er.

Dennis D. Clark, Attorney, U.S. Dept. of
Labor, Washington, D.C., also entered an
appearance, for petitioner.

Larry W. Blalock, Charleston, W. Va.,
for respondents.

L. Joseph Ferrara, Attorney, Federal
Mine Safety and Health Review Com'n,

Washington, D.C., also entered an appearance, for respondents.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and GIBSON,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The Secretary of Labor and the Mine Safety and Health Administration (Secretary), on behalf of veteran coal miner John W. Bushnell, seeks review of a Federal Mine Safety and Health Review Commission (FMSHRC or Commission) decision rejecting the Secretary's conjoint interpretations of 30 C.F.R. § 90.103 and section 101(a) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. § 811(a). In a complaint filed with the Commission, the Secretary alleged that Cannelton Industries, Inc. (Cannelton), Bushnell's employer, had failed to accord Bushnell the prescribed compensation protection when it transferred him and reduced his pay as part of a company-wide work force reduction and realignment. The Commission held that the regulations and the Mine Act protect a miner against pay reductions only upon his transfer to a low-dust work area after exhibiting evidence of pneumoconiosis (black lung disease), and not upon subsequent transfers for other reasons.

We hold that when the Secretary and the Commission disagree on the interpretation of ambiguous provisions of the Mine Act, and both present plausible readings of the legislative text, this court owes deference to the Secretary's interpretation. In Bushnell's case, we conclude, the Commission failed to extend due deference to the Secretary's interpretation. Accordingly, we grant the Secretary's petition for review and reverse the Commission's decision.

* Of the United States Court of Appeals for the Eighth Circuit, sitting by designation pursuant

I. BACKGROUND

Section 101(a) of the Mine Act, 30 U.S.C. § 811(a), directs the Secretary, by rule, to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." Section 101(a)(7) specifically provides:

Where appropriate, the mandatory standard shall provide that where a determination is made that a miner may suffer material impairment of health or functional capacity by reason of exposure to the hazard covered by such mandatory standard, that miner shall be removed from such exposure and reassigned. Any miner transferred as a result of such exposure shall continue to receive compensation for such work at no less than the regular rate of pay for miners in the classification such miner held immediately prior to his transfer. In the event of the transfer of a miner pursuant to the preceding sentence, increases in wages of the transferred miner shall be based upon the new work classification.

*Id.* § 811(a)(7).

The Mine Act also prescribes a series of "interim mandatory health standards applicable to all underground coal mines until superseded in whole or in part by improved mandatory health standards promulgated by the Secretary." *Id.* § 841(a). These interim provisions—drawn from the Coal Act, which was superseded by the Mine Act in 1977—include standards to protect miners who exhibit evidence of pneumoconiosis. Section 203(b), in particular, provides that such a miner shall be afforded the option of transferring to work with lower dust exposure. *Id.* § 843(b)(1). Upon exercising the option, section 203(b)(3) provides, in harmony with section 101(a)(7), that the miner "shall receive compensation for such work at not less than the regular rate of pay received by him immediately prior to his transfer." *Id.* § 843(b)(3).

to 28 U.S.C. § 294(d).

Pursuant to Mine Act section 101(a), in 1980, the Secretary promulgated an improved mandatory health standard, 30 C.F. R. Part 90, to protect miners "who have evidence of the development of pneumoconiosis." 45 Fed.Reg. 80,760 (1980) (final rule). Under the improved standard, a miner who shows signs of pneumoconiosis must be notified in writing of his eligibility to elect "Part 90 miner" status. 30 C.F.R. §§ 90.2, 90.3(a). If the miner elects that status, the operator must maintain the average concentration of respirable dust in the miner's work area at or below one milligram per cubic meter of air. *Id.* § 90.100. "Whenever a Part 90 miner is transferred in order to meet the respirable dust standard ... the operator shall transfer the miner to an existing position at the same coal mine on the same shift or shift rotation" unless "the miner agrees in writing" to a transfer of a different character. *Id.* § 90.102(a). "Any Part 90 miner who is transferred to a position at the same or another coal mine shall remain a Part 90 miner entitled to full [Part 90] rights at the new work assignment." *Id.* § 90.3(c).

The Part 90 regulation centrally at issue in this case provides in pertinent part:

(a) The operator shall compensate each Part 90 miner at not less than the regular rate of pay received by that miner immediately before exercising the [Part 90] option....

(b) Whenever a Part 90 miner is transferred, the operator shall compensate the miner at not less than the regular rate of pay received by that miner immediately before the transfer.

*Id.* § 90.103. Subsection (d) adds that "the operator shall pay each Part 90 miner the actual wage increases that accrue to the classification to which the miner is assigned." *Id.* § 90.103(d).

Section 105(c)(1) of the Mine Act, 30 U.S. C. § 815(c)(1), provides:

No person shall ... discriminate against ... or otherwise interfere with the exer-

cise of the statutory rights of any miner ... because such miner ... is the subject of medical evaluations and potential transfer under a standard published pursuant to section 811 of this title ... or because of the exercise by such miner ... of any statutory right afforded by this chapter.

Any miner who believes that he has been "interfered with, or otherwise discriminated against by any person in violation of this subsection" may file a complaint with the Secretary; if the Secretary "determines that the provisions of this subsection have been violated," she shall immediately file a complaint with the Commission and propose an order granting appropriate relief. *Id.* § 815(c)(2).

Bushnell, a Cannelton employee for some seventeen years, was first informed that he was eligible for transfer to a less dusty job in 1972. Stipulations, Joint Appendix (J.A.) at 4. According to a September 29, 1986 stipulation, submitted by counsel for Cannelton, J.A. at 6, and incorporated into the Administrative Law Judge's record, *Secretary of Labor v. Cannelton Indus., Inc.,* 8 F.M.S.H.R.C. 1607, 1608 (A.L.J.1986), Bushnell exercised his Part 90 right to transfer in or around June 1980.[1] The parties stipulate that from September 3, 1980 until September 16, 1984, Bushnell worked as a dispatcher; as of September 16, 1984, his compensation was $133.28 for an eight-hour shift. Stipulations, J.A. at 4. On September 17, 1984, Bushnell was reassigned to "general inside laborer" work as part of a general realignment due to adverse economic conditions. *Id.* In this position, he was paid $104.78 for an eight-hour shift. *Id.* at 5. On October 1, 1984, the mines were closed, and all remaining employees, including Bushnell, were laid off. As a result of his transfer from dispatcher to general inside laborer, Bushnell suffered a wage loss of $161.14. *Id.*

On November 9, 1984, Bushnell filed a complaint with the Secretary under section 105(c)(2) of the Mine Act. Following an

---

**1.** According to the findings of fact of the Administrative Law Judge (ALJ) in this case, however, purportedly based on the stipulations submitted by the parties, Bushnell exercised his Part 90 option and transferred to a less dusty job in January 1980. 8 F.M.S.H.R.C. at 1608. Nothing in the record indicates Bushnell's rate of pay when he first elected Part 90 status.

investigation, the Secretary, on August 21, 1985, filed a complaint with the Commission. On July 17, 1986, the Administrative Law Judge (ALJ) granted the parties' motion to submit the case on fact stipulations and briefs without a hearing. In a decision dated October 21, 1986, the ALJ held that Cannelton had unlawfully cut Bushnell's pay when it reassigned him to a general inside laborer position. 8 F.M.S.H.R.C. at 1609.[2] The ALJ's order directed Cannelton to pay Bushnell $161.12 in lost wages, with interest, and assessed a civil penalty of $25 pursuant to section 110 of the Mine Act.[3] *Id.* at 1609–10.

On February 26, 1988, the Commission reversed, vacated the back pay award and the civil penalty, and dismissed the complaint. 10 F.M.S.H.R.C. at 152, 160 (Rev. Comm'n 1988). The Commission held that Cannelton's failure to maintain Bushnell's rate of pay upon his transfer for reasons unrelated to dust exposure did not violate the Mine Act or Part 90. *Id.* at 153. The contrary view, advanced by the Secretary and adopted by the ALJ, the Commission concluded, "reaches beyond the language and intent of the Mine Act and of the Secretary's own regulations." *Id.* at 157.[4] Contesting the Commission's judgment, the Secretary petitions this court for review.

## II. DISCUSSION

■ The legislative history of the Mine Act indicates that "the Secretary's interpretations of the law and regulations shall be given weight by both the Commission and the courts." S.REP. NO. 181, 95th Cong., 1st Sess. 49 (1977), *reprinted in* 1977 U.S.Code Cong. & Admin.News 3401, 3448;

*see Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1552 & n. 9 (D.C.Cir.1984) (FMSHRC errs when it accords no deference to the Secretary's determination under section 3(h)(1) of the Mine Act). When the Secretary and the Commission divide, it therefore appears that the Secretary rather than the Commission is entitled to the deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 & n. 2 (D.C.Cir.1986); *Simpson v. FMSHRC*, 842 F.2d 453, 458 (D.C.Cir.1988). The Secretary, the Commission, and this court, of course, "must give effect to the unambiguously expressed intent of Congress," but when "the statute is silent or ambiguous with respect to the specific issue," the question for this court and the Commission is whether the Secretary's interpretation is "a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.

The Secretary is emphatically due this respect when she interprets her own regulations. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed. 2d 616 (1965). We read 30 C.F.R. § 90.103 with this special deference in mind. The Secretary argues in particular that subsection (b), commanding protection of a miner's pay rate "[w]henever a Part 90 miner is transferred," applies not only to transfers to avoid exposure to dust, but also to subsequent transfers of a Part 90 miner for other reasons. 30 C.F.R. § 90.103(b) (emphasis added). What rate is shielded?

---

**2.** The regulations define "transfer" to include "[a]ny change in the occupation code of a Part 90 miner." 30 C.F.R. § 90.2. The ALJ concluded that "whenever a Part 90 miner has a change in his occupation code, the regulation require [sic] that he be paid at not less than the regular rate of pay received prior to the change." 8 F.M.S.H.R.C. at 1608. Cannelton violated the "plain language" of the regulation, the ALJ stated, when Bushnell's "occupational code was changed without retention of the rate of pay he received prior to the change." *Id.* at 1609.

**3.** That provision requires the Secretary to assess a civil penalty not exceeding $10,000 for each

violation of a mandatory health or safety standard. 30 U.S.C. § 820(a).

**4.** The Commission believed that the Secretary and ALJ had incorrectly read the Mine Act and Part 90 regulations as granting "Part 90 miners a *vested* pay entitlement that insulates them against all negative business and economic contingencies affecting their employers." 10 F.M.S.H.R.C. at 154–55 (emphasis in original). As Bushnell's case itself illustrates, however, Part 90 does not insulate transferred miners against layoff.

The Secretary observes that section 90.-103(b) protects "the regular rate of pay received by that miner immediately before the transfer," *id.*, a rate that, consistent with statutory (section 101(a)(7)) and regulatory (section 90.103(d)) prescription, includes wage increases gained by the miner in the position from which he is being transferred. The Secretary's interpretation thus shields not simply the wage received prior to a dust-related transfer, it also safeguards wage increases received by a Part 90 miner in each new classification.[5]

The Commission, however, concluded that "a plain reading" of section 90.103(b) "in its proper context" does not support the Secretary's interpretation. *Cannelton*, 10 F.M.S.H.R.C. at 157. The Commission read "whenever" in subsection (b) to refer back to subsection (a), which speaks only to the exercise of the Part 90 option. Accordingly, the Commission held that subsection (b) protects compensation of miners only upon transfers related to dust exposure.

We examine the interpretation question dividing Secretary and Commission under two headings. First, does the statute permit the Secretary to adopt as an improved mandatory health standard, *see supra* p. 1433, a regulation that protects the pay of a Part 90 miner at each job transfer, and at the rate gained in the immediately preceding position?[6] Second, is the Secretary's regulation reasonably read to provide the protection the Secretary construes it to afford?

## A. *The Secretary's Authority Under the Mine Act*

█ To support its reading of section 90.103(b) as not only proper but indeed statutorily necessary as well, the Commission called attention to the language, legislative history, and purpose of section 101(a)(7) of the Mine Act. Cannelton harmoniously notes that the regulations must be read consistently with this statutory provision. Response Brief of Cannelton Industries, Inc. at 10. The Commission quoted that provision, 30 U.S.C. § 811(a)(7) ("Any miner transferred as a result of such exposure shall continue to receive compensation for such work at no less than the regular rate of pay for miners in the classification such miner held immediately prior to his transfer."), and asserted that "the express language of the Act limits compensation protection to transfers resulting from the removal of miners from dusty work environments." *Cannelton*, 10 F.M.S.H.R.C. at 157.

The Secretary, however, reads section 101(a)(7) as a basic protection for the miner, a floor, not a ceiling, on health standards for pneumoconiosis sufferers. She relies on her general charge under section 101(a) of the Mine Act, 30 U.S.C. § 811(a), to "develop, promulgate, and revise ... improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." *See* Brief for the Secretary of Labor at 4. This court has upheld the Secretary's

5. The Commission recognized that the Secretary sought to protect the rate Bushnell was receiving "immediately prior to his transfer." *Cannelton*, 10 F.M.S.H.R.C. at 152; *see id.* at 153 (ALJ had required that Bushnell be paid "at the same rate of pay after his transfer as he had received before the transfer"); *id.* at 154 (ALJ had required that Bushnell " 'be paid at no less than the regular rate of pay received prior to that change' ") (quoting *Cannelton*, 8 F.M.S.H.R.C. at 1608); *supra* note 2. Apparently because it was understood by all participants that the Secretary considered the wage shield prescribed by her regulation to cover every move of a Part 90 miner, each time at whatever rate he had gained just prior to the move, the parties' stipulation of relevant facts makes no reference to Bushnell's pay rate at the time of his initial Part 90 transfer. *See* Response Brief of Cannelton Industries, Inc. at 5; *see also id.* at 6-7 (Secretary interprets regulations to prohibit reducing the pay of a Part 90 miner whenever he is transferred, even though the transfer is unrelated to health and safety).

6. The Secretary argues that challenge to the validity of a mandatory health standard set by rule is foreclosed in enforcement proceedings. Brief for the Secretary of Labor at 25 n. 13 (quoting section 101(d), 30 U.S.C. § 811(d)). The standard at issue, however, is susceptible of more than one reading. Recognizing that the Secretary's current interpretation was not entirely apparent at the pre-enforcement stage, we proceed to consider on its merits the argument that the statute does not leave room for the regulatory interpretation the Secretary now proffers.

transfer and rate-retention prescriptions under analogous standard-setting authority Congress entrusted to the Secretary in the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 655. *See United Steelworkers v. Marshall,* 647 F.2d 1189, 1230 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *AFL & CIO v. Marshall,* 617 F.2d 636, 674–75 (D.C.Cir.1979), *modified and remanded on other grounds sub nom. American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *Industrial Union Dep't v. Hodgson,* 499 F.2d 467, 485 (D.C. Cir.1974).[7]

While section 101(a)(7), viewed in isolation, might be read to support the Commission's decision, we cannot call unreasonable the Secretary's insistence that a minimum safeguard for the miner should not serve as an unmovable defensive line for the operator. The interplay between the statutory provisions in question—the specific section 101(a)(7) protection, and the general section 101(a) authority for rules establishing improved mandatory health standards—was not addressed, perhaps not even adverted to, by Congress. We find an ambiguity, a congressional silence here that allows room for interpretation. This court has several times observed that the " 'primary purpose' " of the Mine Act was " 'to protect mining's most valuable resource—the miner' " and that " 'Congress intended the Act to be liberally construed' " to achieve this goal. *International Union, United Mine Workers v. Mine Safety & Health Admin.,* 823 F.2d 608, 617 (D.C. Cir.1987) (quoting *International Union, United Mine Workers v. Kleppe,* 532 F.2d 1403, 1405–06 (D.C.Cir.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976)). Confronting diverse readings of the statutory text, we are obliged to defer to the Secretary's miner-protective construction of the Mine Act so long as it is reasonable.

Neither the Commission nor Cannelton came upon any authority plainly revealing specific congressional intent to *exclude* the protection that the Secretary is urging. The Commission, *Cannelton,* 10 F.M.S.H. R.C. at 158, featured legislative history stating that a transferred Part 90 miner "will be entitled only to the same dollar rate increase applicable to his new job classification," and indicating concern that "miners who do participate in such programs shall suffer no immediate financial disadvantage if a medical examination results in a job reassignment." H.R.CONF. REP. No. 655, 95th Cong., 1st Sess. 42 (1977), *reprinted in* 1977 U.S.CODE CONG. & ADMIN.NEWS 3490, *quoted in* Response Brief of Cannelton Industries, Inc. at 13. Those quotes will not bear the weight the Commission would place on them. The first refers solely to a limit on wage *increases.* The second reveals an intent to cushion the impact of an unfavorable medical report. Neither signals that "immediate" wage cuts are *all* that the Secretary may prohibit.

The Secretary warns that the Commission's interpretation removes "a key incentive to miner participation in the [Part 90] program." Brief for the Secretary of Labor at 17. "[A] guarantee of future increases after a dust-related transfer," the Secretary maintains, "has little meaning unless the miner is assured retention of those increases in the event of later reassignments over which he has no control." *Id.* at 20; *accord* Reply Brief for the Secretary of Labor at 5–6. Furthermore, the Secretary points out that "the jobs involving lower dust exposure (*e.g.,* maintenance and other support functions) are often of less critical importance to the mine's operation, and thus may be subject to greater curtailment and realignment in times of economic distress." *Id.* at 7–8. Thus, were the Commission's position to prevail, miners would face a double disincentive to Part 90 status election. Not only would there be a greater risk of layoff, but "the

---

7. In the OSHA cases, as in this one, the Secretary drew support from findings of legislative fact in the record. *Compare, e.g., Steelworkers,* 647 F.2d at 1237, *with* 45 Fed.Reg. 80,763 (1980)

(preamble to final rule); 45 Fed.Reg. 24,018 (1980) (preamble to proposed rule). *See infra* p. 1438.

risk of subsequent transfer (and consequent pay reduction)" would be "greater in a low-dust position than in their existing work." Brief for the Secretary of Labor at 21.

We are aware that the Secretary's reading of the statute and regulations affords generous protections to the Part 90 miner. The Secretary's authority under section 101(a) to develop improved mandatory health standards, we recognize, is large but not limitless. We cannot say, however, that the Secretary has, in this matter, moved beyond her statutory authority. For the reasons set out above, we hold that the Commission erred insofar as it held that section 101(a)(7) necessarily operates as a ceiling as well as a floor on rate-retention prescriptions the Secretary may by rule adopt in the interest of protecting the lives and health of miners afflicted with black lung disease.

B. *The Language and History of the Regulation*

■ Satisfied that the Secretary's interpretation of 30 C.F.R. § 90.103(b) is consistent with the Mine Act, we now turn to the regulation itself to determine whether the Secretary's Part 90 rules are reasonably read to provide the protection the Secretary claims they afford. The Secretary stresses that section 90.103(b) protects a miner's rate of pay "[*w*]*henever* a Part 90 miner is transferred." 30 C.F.R. § 90.103(b) (emphasis added). The Commission, however, read section 90.103(b) not independently, but as circumscribed by section 90.103(a), which refers to the exercise of the Part 90 option. *Cannelton*, 10 F.M.S.H.R.C. at 157.[8] In short, the Commission reads "[w]henever a Part 90 miner is transferred" to mean "whenever a Part 90 miner is transferred in order to meet the respirable dust standard."

The Secretary contrasts the language of section 90.103(b) with section 90.102(a), which is explicitly limited to dust-related transfers; section 90.102(a) limits the positions to which a miner may be transferred "[w]henever a Part 90 miner is transferred in order to meet the respirable dust standard." 30 C.F.R. § 90.102(a), *quoted supra* p. 1434. The preamble to the final rule explains that these section 102(a) limits do not apply when circumstances other than the dust standard, such as "[r]eductions in workforce or changes in operational methods at the mine," require changes in job assignments. 45 Fed.Reg. 80,761 (1980) (preamble to final rule). The preamble adds that "[a]ny such transferred Part 90 miner would still be protected by all other provisions under this Part." *Id.* Those "other provisions" include the section 90.-103 wage protections. This account of the compass of section 90.103 is supported by section 90.3(c), which states: "Any Part 90 miner who is transferred to a position at the same or another coal mine shall remain a Part 90 miner entitled to full rights under this part at the new work assignment." 30 C.F.R. § 90.3(c).

The Secretary's reading, if not the only plausible one, is consistent with the language of the regulation. If section 90.-103(b) were confined in the manner that the Commission supposed, the Secretary could have easily made such a limit explicit, as in section 90.102(a). Because no "plain meaning" is manifest on the face of the regulation, we turn to the Secretary's claim that her interpretation is reasonable and fully consonant with the administrative history and purposes of Part 90.

The preamble to the proposed rule stated that the Secretary promulgated Part 90 in 1980 "to improve the health protection of miners by increasing miner participation in the Part 90 program." 45 Fed.Reg. 24,018 (1980) (preamble to proposed rule). Noting that "the limited economic protection offered by section 203(b)"—*i.e.*, by existing law based on the Coal Act—"may have had the effect of discouraging eligible miners from exercising their option," the preamble to the final rule stated that the Secretary sought to "provide eligible miners with significant additional protections against fears about job security, adverse economic consequences, undesirable working hours, wages and work assignments." *Id.; accord* 45

---

8. The text of § 90.103(a), (b) is set out *supra* p. 1434.

Fed.Reg. 80,763 (1980) (preamble to final rule). "Based on several comments received," the preamble concluded that "a Part 90 miner should not suffer *any* loss in pay *whenever* an operator transfers the miner," because "[i]f any eligible miner perceived that their rate of pay could be decreased upon *any* transfer, the incentive to exercise the Part 90 option would be reduced." *Id.* at 80,766 (emphasis added).

The preamble thus strongly supports the Secretary's current reading because section 203(b), carried over from the Coal Act, *already* protected a miner's rate of pay upon the initial transfer out of dusty work. The Secretary, we are satisfied, reasonably maintains that section 90.103 was promulgated not only to provide for wage increases "that accrue to the classification to which the [Part 90] miner is assigned," section 90.103(d), but also to protect against wage decreases "[w]henever a Part 90 miner is transferred," section 90.103(b), *i.e.*, upon *any* transfer of a miner who has opted for Part 90 status.

### CONCLUSION

For the reasons stated, we hold that the Commission failed to extend the appropriate deference to the Secretary's interpretation of her own regulations and of the Mine Act. The Commission erred insofar as it held that section 90.103(b) protects the Part 90 miner's wage only upon dust-related transfers and that a contrary interpretation would violate the Mine Act. Accordingly, we reverse the Commission's decision and remand this case to the Commission with directions to adopt the ALJ's decision in favor of Bushnell.

IT IS SO ORDERED.