**ENERGY WEST MINING COMPANY,**
**Petitioner**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and Secretary of Labor, Respondents**

No. 96–1243.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 4, 1997.

Decided April 25, 1997.

Timothy M. Biddle, Washington, DC, argued the cause for the petitioner. Thomas C. Means was on brief.

Yoora Kim, Attorney, United States Department of Labor, argued the cause for the respondents. J. Davitt McAteer, Acting Solicitor of Labor, and W. Christian Schumann, Counsel, United States Department of Labor, were on brief. Norman M. Gleichman, General Counsel, Mine Safety and Health Review Commission, entered an appearance.

Before EDWARDS, Chief Judge, and HENDERSON and ROGERS, Circuit Judges.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Petitioner Energy West Mining Co. (Energy West) seeks review of a decision of the Federal Mine Safety and Health Review Commission (FMSHRC or Commission) affirming the decision of the Administrative Law Judge (ALJ) to uphold a withdrawal order issued to Energy West under section 104(b) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. § 814(b), for failure to abate a previously cited violation of 30 C.F.R. § 70.100(a). *Secretary of Labor v. Energy West Mining Co.,* 18 F.M.S.H.R.C. 565 (1996). Because the Commission reasonably construed and applied section 104(b), we conclude that no review is warranted.

Section 101 of the Mine Act requires the Secretary of the Department of Labor (Secretary) to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811. The standards require that each mine operator "continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of each mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter of air." 30 C.F.R. § 70.100(a). To monitor compliance with the standard the Secretary has required each operator to "take five valid respirable dust samples from the designated occupation in each mecha-

nized mining unit during each bimonthly period beginning with the bimonthly period of November 1, 1980." 30 C.F.R. § 70.207(a).[1] In April 1992 Energy West submitted to the Department of Labor's Mine Safety and Health Administration (MSHA) its first bimonthly coal dust level samples for Mechanized Mining Unit 015 (MMU 015), then operating in the 4th West longwall section of the Cottonwood mine in central Utah. The sampling revealed an average dust concentration of 1.4 milligrams per cubic meter (mg/m$^3$), below the maximum permissible level of 2.0 mg/m$^3$. The next sampling, however, taken in June 1992, showed an average concentration of 2.2 mg/m$^3$, over the legal limit. Accordingly, on June 25, 1992 MSHA cited Energy West under section 104(d)(1) of the Mine Act[2] for a "significant and substantial" violation of the standard in 30 C.F.R. § 70.100(a). The citation provided that "Management shall take corrective action to lower the respirable dust and then sample each production shift until five valid samples are taken and submitted" and gave Energy West until July 14, 1992 to abate the violation. Joint Appendix (JA) 12.

After attempting some abatement measures Energy West took new samples on July 1, 2, and 3, 1992, as required by the citation, and submitted them to MSHA. On July 10, 1992, without waiting for the sample results, Energy West moved MMU 015 from 4th West about two miles away to the 11th Right section of the mine, where, according to testimony before the ALJ, different roof conditions and greater moisture would reduce the respirable dust level problem.[3] As an added precaution, Energy West provided workers at the site with "RACAL airstream helmets" to filter dust from the air they breathed.[4]

On July 15, while examining records during a regularly scheduled inspection of the mine, MSHA Inspector Fred Marietti was recalled to the MSHA field office and advised that the July 1, 2 and 3 samples showed increases both in the average dust concentration level, from 2.2 to 2.3 mg/m$^3$, and in the number of samples registering over 2.0 mg/m$^3$, from two to three. Marietti immediately issued and personally delivered a section 104(b) withdrawal order based on Energy West's failure to abate the section 70.100(a) violation, directing that MMU–015 cease operation "until the operator submitts [sic] a plan to the District Nine Manager for approval to lower the average concentration of respirable dust to the required level." JA 13. In the order, Marietti expressly found:

1. Each operator must also "take one valid respirable dust sample *from each designated area* on a production shift during each bimonthly period beginning with the bimonthly period of December 1, 1980." 70 C.F.R. § 70.208(a) (emphasis added).

2. This section provides:
    (1) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter. If, during the same inspection or any subsequent inspection of such mine within 90 days after the issuance of such citation, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) of this section to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.
    30 U.S.C. § 814(d)(1).

3. The ALJ found: "Conditions on 11th Right were dramatically different from 4th West. Most notably, where 4th West was dry, 11th Right was very wet. In addition, unlike 4th West, where face burst and rock in the roof were problems, on 11th Right, problems were encountered with the top, resulting in lower production." *Secretary of Labor v. Energy West Mining Co.*, 16 F.M.S.H.R.C. 835, 843 (1994) (record citations omitted).

4. According to the ALJ, "[t]hese helmets provide a virtually dustfree air supply to miners, reducing respirable dust exposure *to insignificant levels.*" 16 F.M.S.H.R.C. at 843.

"Due to the obvious lack of effort by the operator to control the respirable dust, the period of reasonable time for abatement cannot be extended." *Id.* Later the same day, Marietti amended the order to permit mining to resume provided Energy West complied with a dust reduction plan approved by the MSHA district manager. The amended order also called for increased air velocity and water pressure and additional spraying as well as the continued use of airstream helmets. JA 14. The order was terminated on July 22, 1992 after sampling at 11th Right showed an average respirable dust concentration of 1.8 mg/m$^3$. JA 15.

Energy West contested the citation and withdrawal order and a hearing was held before the ALJ on August 31 and September 1, 1993, during which the ALJ, with MSHA's consent, eliminated the "significant and substantial" designation from the citation.[5] On April 18, 1994 the ALJ affirmed the July 15, 1992 withdrawal order and imposed a penalty of $3,000. *Secretary of Labor v. Energy West Mining Co.*, 16 F.M.S.H.R.C. 835 (1994). In affirming the withdrawal order, the ALJ stated:

Inspector Marietti realized, upon review of the records, that during the 21–day abatement period, the level of respirable dust had not been diminished in any respect, but indeed had climbed. It is more than reasonable to assume that if a diligent effort had been made that it would be reflected in the sample results. That is, the abatement samples would show a decline in respirable dust, rather than an increase. In addition, if a diligent effort to control dust had been made by the operator, the individual samples should have improved over the abatement time. Instead, the individual samples that were out of compliance had increased from two to three. An increase in the average concentration and an increase in the individual concentrations clearly indicate that the

mine made little effective effort to correct the respirable dust violation.

16 F.M.S.H.R.C. at 849.

Energy West sought and obtained discretionary review from the Commission which affirmed the ALJ's disposition of the withdrawal order, concluding that "substantial evidence supports the judge's determination that Inspector Marietti did not abuse his discretion when he issued the order" and that "substantial evidence supports the judge's finding that Energy West 'made only a minimal and inadequate effort to control dust.'" 18 F.M.S.H.R.C. at 569–70 (quoting 16 F.M.S.H.R.C. at 847). The Commission expressly "reject[ed] Energy West's argument that the judge erred in failing to consider its move of the MMU as part of its abatement efforts," observing that "[a]pparently the inspector was unaware of the movement of MMU 015–0 at the time he issued the order" and that "[i]f the MMU was moved as a further abatement measure, that fact could have been brought to MSHA's attention at the time of the move." 18 F.M.S.H.R.C. at 570. Nevertheless, the Commission remanded for redetermination of the penalty in light of the mitigating factor that Energy West required workers to wear airstream helmets throughout the violation period.[6] On remand the ALJ decreased the penalty to $850, pursuant to the parties' stipulation. *Secretary of Labor v. Energy West Mining Co.*, 18 F.M.S.H.R.C. 887 (1996). Energy West again petitioned the Commission for discretionary review which was summarily denied on June 12, 1996. *Secretary of Labor v. Energy West Mining Co.*, 1996 WL 324725 (F.M.S.H.R.C.) (1996). Energy West petitions the court for review of the Commission's decision to uphold the section 104(b) withdrawal order.

Section 104(b) of the Mine Act provides:

If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a

---

5. The ALJ explained: "The Secretary agreed to such an amendment based upon affidavits submitted by the operator showing that the miners who were exposed to the levels of respirable dust listed in the citation were all wearing personal protective equipment." 16 F.M.S.H.R.C. at 837.

6. Two of the four commissioners wrote separately. Commissioner Marks concurred in the affirmance of the withdrawal order and dissented from the penalty remand, while Commissioner Holen concurred in the penalty remand and dissented from the withdrawal order affirmance.

violation described in a citation issued pursuant to subsection (a) of this section has not been totally abated within the period of time as originally fixed therein or as subsequently extended, and (2) that the period of time for the abatement should not be further extended, he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons, except those persons referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

30 U.S.C. § 814(b). Energy West asserts that Marietti failed to make a sufficient "follow-up inspection" to support a finding that the abatement period should not be extended. According to Energy West, Marietti was under a statutory duty to personally inspect the cited MMU, or at least to make some independent inquiry into the abatement measures taken, before he issued the section 104(b) withdrawal order. If he had conducted such an inspection, Energy West maintains, he would have discovered that substantial, effective efforts to abate the hazard had been taken, notably the relocation of MMU 015, and consequently would have found that the abatement period should be extended. We uphold the Commission's decision because it reflects a reasonable construction of section 104(b).

As the Commission observed below: "The Act does not address the extent of an inspector's inquiry in making the determination of whether abatement time should be extended. Nor is the extent of inquiry addressed in legislative history." 18 F.M.S.H.R.C. at 569 (citations omitted). This court has acknowledged that the term "inspection" has no "plain meaning" in other related sections of the Mine Act and we have in fact concluded that, as used in section 104(d), the term

"must cover more than direct observation." *Emerald Mines Co. v. FMSHRC*, 863 F.2d 51, 55 (D.C.Cir.1988). Here, as in *Emerald Mines*, because "the Mine Act is 'silent or ambiguous with respect to the specific issue,'" we "need ask only whether the FMSHRC's interpretation is 'rational and consistent with the statute,' ... according deference to 'reasonably defensible' constructions of the Mine Act by the Commission." 863 F.2d at 53 (quoting *Simpson v. FMSHRC*, 842 F.2d 453, 458 (D.C.Cir.1988)) (ellipsis in original). Further, "[t]he respect due to FMSHRC is heightened in this case because the Secretary agrees with the Commission." *Id.* (citing *Emerald Mines*, 863 F.2d at 53). We find the Commission's decision passes muster under our highly deferential standard of review.

The Commission concluded that Marietti's inspection was adequate because he "considered the fact that, during the three week abatement period, excessive dust concentrations had not diminished but had, in fact, increased; that the number of individual samples out of compliance had increased from two out of five to three out of five, and that Energy West had been cited frequently for failure to comply with section 70.100(a)." 18 F.M.S.H.R.C. at 569–70. We agree with the Commission that these facts permitted Marietti without further inquiry to "find," as the statute requires, that the abatement period should not be extended. As the inspector, the ALJ and the Commission all concluded, a rise during the abatement period in the average concentration level and the number of samples in violation inferentially supports the finding that no effective abatement measures had been undertaken, as does Marietti's familiarity with Energy West's history of violations and its apparent unwillingness to incorporate into its ventilation plan measures it knew to be palliative.[7] That Marietti looked no further than the sample test results was understandable given that both the Secretary's regulations and the withdrawal order

---

7. Marietti testified that Energy West's chief safety engineer, Randy Tatton, had told him the operator "didn't want to include" measures such as additional sprays, increased air and different locations "because they didn't want to get violations, and if they did, that they would have nowhere to go to abate the violations." Tatton himself testified that "if we were to get parameters in our plan that were at the very max, then, you know, we have nowhere to go." 16 F.M.S.H.R.C. at 847–48.

prescribe sample testing as the appropriate means for ascertaining respirable dust concentration levels.[8]

We also agree with the Commission that the burden rested on Energy West to bring to MSHA's attention any specific abatement measures justifying extension of the abatement period, particularly in the face of what appeared to be deteriorating mine conditions. Energy West knew that MMU 015's respirable dust levels remained high at least until its relocation on July 10 and that the July 1, 2 and 3 samples the petitioner submitted to MSHA would no doubt reflect that fact. If Energy West believed that moving the MMU justified an extension of the abatement period despite the high dust levels, it should have brought those actions to MSHA's attention before the abatement period ended and the withdrawal order issued. It could easily have done so during Marietti's July 15, 1992 mine visits and it apparently did not do so—at its own peril.

For the preceding reasons, the petition for review is

*Denied.*

---

**8.** Given the evidence of *increased* hazard during the abatement period we need not address Energy West's contention that mere continuation of a violation cannot support a finding that the abatement period should not be extended.