**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CAPITOL CEMENT CORPORATION,
Petitioner,

v.

SECRETARY OF LABOR, MINE

No. 99-2264

SAFETY AND HEALTH ADMINISTRATION
(MSHA); FEDERAL MINE SAFETY &
HEALTH REVIEW COMMISSION,
Respondents.

On Petition for Review of an Order
of the Federal Mine Safety and Health Administration.
(95-194-M-WEVA, 95-321-M-WEVA)

Argued: May 1, 2000

Decided: August 24, 2000

Before MOTZ and TRAXLER, Circuit Judges, and
Frank W. BULLOCK, Jr., United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Dana Lewis Rust, MCGUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., Richmond, Virginia, for Petitioner. Jack Powasnik,
Office of the Solicitor, UNITED STATES DEPARTMENT OF
LABOR, Washington, D.C., for Respondents. **ON BRIEF:** E. E.

Mathews, III, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Petitioner. Henry L. Solano, Solicitor of Labor, Edward P. Clair, Associate Solicitor, W. Christian Schumann, Counsel, Appellate Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Capitol Cement Corporation ("Capitol") has petitioned for review of a final decision of the Federal Mine Safety and Health Review Commission (the "Commission"). The Commission affirmed two "unwarrantable failure" citations and a withdrawal order issued to Capitol by the Mine Safety and Health Administration ("MSHA") and affirmed the civil penalties assessed for the violations.**1** The Commission also concluded that Capitol had not been denied due process of law during the hearing before the administrative judge. For the following reasons, we affirm the decision of the Commission.

I.

This case arises from two separate incidents at Capitol's Martinsburg plant in Berkeley County, West Virginia (the"Martinsburg plant"). The Martinsburg plant consists of a limestone quarry, a crushing facility, and a cement manufacturing facility. On October 21, 1994, Supervisor Gregory Bonfili ("Bonfili") was injured when his right forearm contacted an energized "hot rail" on the overhead crane

_____

**1** The Mine Safety and Health Administration is established within the Department of Labor and represents the Secretary of Labor in enforcing the Federal Mine Safety and Health Act of 1977. See 29 U.S.C. § 557a.

2

at Capitol's Martinsburg plant. The overhead crane, which has an on-board operator and travels along 600-foot-long rails, is used to move material inside a large storage building. The distance from the overhead crane to the ground varies depending on the amount of material below the crane. At the time of Bonfili's accident, the crane was approximately fifty feet from the ground. The crane may be accessed by a walkway, which is three feet wide and runs the length of the crane rails. The walkway has no guardrail, but employees may tie their safety belts to a cable which runs the length of the walkway.

The hot rail, which is used to power the crane, conducts 480 volts of electricity and is located under the walkway. The electrical power of the hot rail is controlled by three separate circuit breakers: (1) a circuit breaker on board the crane de-energizes only the crane and not the hot rail; (2) a circuit breaker on the third floor of the building, which at the time of the accident was one level below the crane, de-energizes the crane and the hot rail; and (3) a circuit breaker on the main floor of the building de-energizes the entire section, including the crane and the hot rail. When the accident occurred, Bonfili was responding to a complaint that the crane was not functioning properly. In an attempt to diagnose the problem, Bonfili, without a safety belt, went on the walkway and, without de-energizing the hot rail, reached over the side of the walkway. Bonfili's right forearm contacted the hot rail and was severely burned.

Following an accident investigation by Edward Skvarch ("Inspector Skvarch"), an inspector for MSHA, two citations were issued and civil penalties were proposed against Capitol. The first citation alleged a "significant and substantial" violation of 30 C.F.R. § 56.12016 based on Bonfili's failure to de-energize the hot rail.[2] The second citation alleged a "significant and substantial" violation of 30 C.F.R. § 56.15005 arising from Bonfili's failure to wear a safety belt when there was a danger of falling.[3] Both the citation under 30 C.F.R.

_____

[2] 30 C.F.R. § 56.12016 provides, in relevant part, "Electrically powered equipment shall be deenergized before mechanical work is done on such equipment. Power switches shall be locked out or other measures taken which shall prevent the equipment from being energized without the knowledge of the individuals working on it."
[3] 30 C.F.R. § 56.15005 states, in relevant part, "Safety belts and lines shall be worn when persons work where there is a danger of falling . . . ."

3

§ 56.12016 and the citation under 30 C.F.R.§ 56.5005 were subsequently modified to allege "unwarrantable failure" violations.**4**

On March 15, 1995, Supervisor Arthur Lozano ("Lozano") was injured when his arm became caught in the head pulley of a conveyor belt. The injury occurred when Lozano attempted to show another miner, Jeff Miller ("Miller"), how to realign a conveyor belt while the belt was energized and running. Specifically, Lozano touched a role of duct tape to the pulley and the tape proceeded to unroll. When Lozano tried to tear the tape, his arm was drawn into the pulley. On April 18, 1995, Inspector Skvarch conducted a regular inspection of the Martinsburg plant. During his review of the company's accident reports, Inspector Skvarch learned that on March 15, 1995, Lozano had been injured while attempting to repair an energized conveyor belt. As a result of this discovery, a citation was issued and a civil penalty was proposed against Capitol. The citation alleged an unwarrantable failure violation of 30 C.F.R. § 56.12016, the lockout regulation.

A hearing on the violations arising from the incident involving Bonfili was originally scheduled for October 5, 1995. The hearing was rescheduled for November 5, 1995, but on October 27, 1995, the administrative judge granted a stay of the hearing pending the resolution of whether criminal charges would be filed against Bonfili. On January 16, 1996, the administrative judge also stayed the hearing in the case arising from the incident involving Lozano. Thereafter, the cases were consolidated for further proceedings.

On August 7, 1996, the administrative judge, without explanation, lifted the stays and a hearing on the Bonfili and Lozano incidents was held on October 30, 1996. At the hearing, due to the possibility that criminal charges could still be brought against him, Bonfili asserted his Fifth Amendment right against self-incrimination. Upon Bonfili's

_____

**4** The Federal Mine Safety and Health Act of 1977 does not define the term "unwarrantable failure"; however, the Commission has held that "unwarrantable failure means aggravated conduct, constituting more than ordinary negligence, by a mine operator in relation to a violation of the [Federal Mine Safety and Health Act]." Emery Mining Corp. v. Secretary of Labor, 9 FMSHRC 1997, 2004 (December 1987).

assertion of his Fifth Amendment rights, Capitol objected to proceeding with the hearing on the grounds that Bonfili's testimony was essential to Capitol's defense in the case. The administrative judge overruled the objection. On February 28, 1997, the administrative judge held additional oral argument to clarify the legal theories presented by the parties in their post-hearing briefs.

On March 7, 1997, the administrative judge affirmed the unwarrantable failure citations arising out of the October 21, 1994, incident involving Bonfili. In the same opinion, the administrative judge affirmed the unwarrantable failure citation arising out of the March 1995 incident involving Lozano. Furthermore, the administrative judge concluded that the exception recognized by the Commission in Secretary of Labor v. Nacco Mining Co., 3 FMSHRC 848, 850 (April 1981), was not established by Capitol in either case,[5] imputed the negligence of Bonfili and Lozano to Capitol, and assessed civil penalties against Capitol totaling $5,350.00. Capitol appealed the ruling to the Commission. On August 18, 1999, the Commission held that the administrative judge did not deprive Capitol of due process of law by declining to stay the cases further and conducting the hearing despite Bonfili's invocation of his Fifth Amendment rights. The Commission also affirmed the administrative judge's conclusion that the misconduct of Bonfili and Lozano was imputable to Capitol for the purpose of determining whether Capitol was liable for the unwarrantable failure violations. Finally, the Commission affirmed the administrative judge's determination that the negligence of Bonfili and Lozano was imputable to Capitol for the purpose of determining the proper civil penalties to be assessed against Capitol.[6] Capitol timely filed this petition for review.

_____

[5] In Secretary of Labor v. Nacco Mining Co., 3 FMSHRC 848, 850 (1981), the Commission declined to impute a supervisor's negligence to the mine operator at the civil penalty stage when determining the extent of the operator's negligence because: (1) the operator took reasonable steps to avoid the class of accident in question; and (2) the supervisor's conduct did not expose other miners to injury. Notably, the Commission has never applied the Nacco exception to permit an operator to preclude a finding of unwarrantable failure nor has the Commission ever applied the exception to mitigate the civil penalty assessed for an unwarrantable failure violation.

[6] Two distinct principles of imputation arise under the Mine Act: (1) the imputation of agents' misconduct to the operator to establish the

5

II.

Capitol contends that the administrative judge deprived it of due process by proceeding with the hearing despite Bonfili's assertion of his Fifth Amendment rights. We review allegations of a due process violation de novo. See Colindres-Aguilar v. Immigration and Naturalization Serv., 819 F.2d 259, 261 (9th Cir. 1987) (recognizing due process claims arising out of a deportation hearing are reviewed de novo). To establish a due process violation, a party must make a showing of substantial prejudice. See id.; see also Farrokhi v. U.S. Immigration and Naturalization Serv., 900 F.2d 697, 702 (4th Cir. 1990) (finding no due process violation where alien could not establish prejudice from the claimed error).

In Capitol's view, the administrative judge should have stayed the cases until the Secretary of Labor (the "Secretary") made a final determination whether to pursue criminal charges against Bonfili. According to Capitol, the administrative judge's decision to proceed with the hearing prejudiced Capitol because evidence of Bonfili's intent at the time of the incident was essential to Capitol's defense to the unwarrantable failure findings.

Although the Commission has held that intentional misconduct may warrant an unwarrantable failure finding, see Secretary of Labor v. Rochester & Pittsburgh Coal Co., 13 FMSHRC 189, 194 (February 1991), the Commission has not held that evidence of a party's subjec-

_____

operator's liability for violations; and (2) the imputation of agents' acts to the operator to establish the extent of the operator's negligence for penalty purposes. See Secretary of Labor v. Southern Ohio Coal Co., 4 FMSHRC 1458, 1463 (August 1982). Although the same or similar factual circumstances may be included in the Commission's consideration of an operator's misconduct with regard to an unwarrantable failure finding and the Commission's evaluation of an operator's negligence for purposes of assessing a civil penalty, the concepts are distinct and subject to separate analysis. See Secretary of Labor v. Black Diamond Coal Mining Co., 7 FMSHRC 1117, 1122 (August 1985). Capitol's appeal is limited to whether the Commission erred by imputing Bonfili's and Lozano's misconduct to Capitol for purposes of the unwarrantable failure finding. (See Pet.'s Br. at 2).

6

tive intent is necessary to justify an unwarrantable failure finding. Instead, the Commission has concluded that an unwarrantable failure finding is justified based on various levels of conduct, including, but not limited to: (1) a serious lack of reasonable care, see Secretary of Labor v. LaFarge Constr. Materials, 20 FMSHRC 1140, 1146 (October 1998); (2) aggravated conduct, see Secretary of Labor v. Warren Steen Constr., Inc., 14 FMSHRC 1125, 1129-30 (July 1992); and (3) indifference, see Secretary of Labor v. Consolidation Coal Co., 22 FMSHRC 328, ___ (March 2000). At the hearing, evidence regarding the circumstances surrounding the violations and evidence detailing the subsequent investigations by the Secretary, as well as evidence regarding Bonfili's supervisory status and evidence concerning the training, which included specific instruction on lock-out procedures and safety belt use, provided by Capitol to Bonfili, was submitted by the parties. Because, contrary to Capitol's assertion, the Commission does not require evidence of a party's subjective intent to justify an unwarrantable failure finding, Capitol was not prejudiced by the administrative judge's decision to proceed with the hearing despite Capitol's inability to elicit testimony from Bonfili. Accordingly, Capitol was afforded a meaningful opportunity to defend against the evidence in this case and was not denied due process.

III.

Capitol also cites the Supreme Court's decision in Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), and argues, as it did before the Commission, that the actions of Bonfili and Lozano were contrary to Capitol's good faith efforts to comply with the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 801-962, and, therefore, the determination that Capitol committed an unwarrantable failure should be vacated.[7] According to Capitol, imputing the misconduct of Bonfili and Lozano to Capitol for purposes of the unwarrantable failure determination, despite Capitol's good faith effort to

_____

[7] In Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), the Supreme Court held that, in a Title VII punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's good faith efforts to comply with Title VII. See id. at 545.

comply with the Mine Act, is contrary to the plain language of the Mine Act and undermines the public policy favoring mine safety. The Commission does not share Capitol's view. In the Commission's view, once it is determined that a supervisor, acting within the scope of his employment, violates the Mine Act or a mandatory health or safety standard, the misconduct of the supervisor may be imputed to the mine operator for purposes of determining whether the violation was the result of the operator's unwarrantable failure to comply with the health or safety standard at issue.

In reviewing the Commission's interpretation of the Mine Act, we must first inquire "whether Congress has directly spoken to the precise question at issue." Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). If the Mine Act's meaning is clear and unambiguous, the inquiry ends. See id. at 842-43. If the Mine Act is silent or ambiguous with respect to a specific issue, we need ask only whether the Commission's interpretation is rational and consistent with the Mine Act, according deference to reasonably defensible constructions of the Mine Act by the Commission. See Energy West Mining Co. v. Federal Mine Safety & Health Review Comm'n, 111 F.3d 900, 903 (D.C. Cir. 1997). Furthermore, the deference due the Commission's interpretation and application of the Mine Act is heightened in this case because the Secretary agrees with the Commission. See id.

The Mine Act directs the Secretary or the Secretary's authorized representatives to inspect coal mines frequently. See 30 U.S.C. § 813(a). If an inspection reveals a violation of the Mine Act, or any mandatory health or safety regulation, the inspector issues a citation to the operator. See 30 U.S.C. § 814(a). If the inspector determines that the violation is both "of such a nature as could significantly and substantially contribute to the cause and effect of a . . . mine safety or health hazard" and "caused by an unwarrantable failure of [the mine] operator to comply with such mandatory health or safety standards," those findings must be included in the citation and still greater civil sanctions may be imposed on the operator. See 30 U.S.C. § 814(d)(1); see also 30 U.S.C. § 820(a).**8**

_____

**8** An unwarrantable failure finding commences a probationary period. If a second violation resulting from an unwarrantable failure is found

Looking only to the text of the Mine Act, the Commission's decision not to permit an operator to avoid an unwarrantable failure finding by establishing that the violation occurred despite the good faith efforts of the operator to comply with the Mining Act is neither compelled nor contradicted by the plain language of the statute. Thus, we must uphold the Commission's interpretation as long as that interpretation is one of the permissible interpretations the Commission could have selected. We need not decide whether the Commission's view is the correct one; our role is simply to determine if the Commission's view is reasonable under the Mine Act. See Secretary of Labor v. Mutual Mining, Inc., 80 F.3d 110, 115 (4th Cir. 1996).

The Commission's decision not to create an exception to the recognized rule that the actions of an operator's agent, acting within the scope of his employment, are imputable to the operator for purposes of an unwarrantable failure finding is not inconsistent with the language of Section 814(d)(1). Furthermore, the Commission's decision in this case is consistent with previous decisions by the Commission and the federal courts which have held that the Mine Act is a strict liability statute. See, e.g., Sewell Coal Co. v. Federal Mine Safety & Health Review Comm'n, 686 F.2d 1066, 1071 (4th Cir. 1982) (stating that under the Mine Act an operator is liable without regard to fault for violations of the Mine Act); Secretary of Labor v. Southern Ohio Coal Co., 4 FMSHRC 1458, 1462 (August 1982) (same). Finally, the Commission's interpretation is compatible with the Mine Act's graduated enforcement scheme. See Emery Mining Corp. v. Secretary of Labor, 9 FMSHRC 1997, 2000 (December 1987) (stating that the enforcement scheme of the Mine Act provides for increasingly severe sanctions for increasingly serious violations or operator behavior).

_____

within ninety days, the Secretary must issue a withdrawal order requiring the mine operator to remove all persons from the area, except specially exempted individuals, until the violation has been abated. See 30 U.S.C. §§ 814(c) & (d)(1). Once an operator has been issued a withdrawal order under Section 814(d)(1), any subsequent violations similar to those that required the issuance of the withdrawal order result automatically in additional withdrawal orders. See 30 U.S.C.§ 814(d)(2). This "chain" of withdrawal order liability remains in effect until broken by an intervening "inspection of such mine [which] discloses no similar violations." Id.

9

The Mine Act makes clear that its "first priority. . . must be the health and safety of its most precious resource--the miner." 30 U.S.C. § 801(a). Capitol argues that the Commission's decision creates a per se unwarrantable failure violation whenever a properly trained supervisor engages in conduct which violates the Mine Act or a mandatory health or safety standard, thereby undermining the goal of the Mine Act and diminishing the incentive for mine operators to train supervisors. We disagree. Contrary to Capitol's assertion, the Commission did not rely solely on Bonfili's supervisor status and training history when affirming the unwarrantable failure findings in this case. The obviousness of the violations and the high degree of danger presented by the violations also were factors in the Commission's decision. (See J.A. at 451). Thus, the conduct at issue in this case is readily distinguishable from other violations committed by a supervisor where the obviousness of the violation and the degree of danger posed by the violation are not as severe. See, e.g., Secretary of Labor v. Gatliff Coal Co., Inc., 14 FMSHRC 1982, 1987-89 (December 1992). Furthermore, notwithstanding the imputation of the supervisors' misconduct to Capitol for purposes of the unwarrantable failure findings in this case, as well as the imputation of the supervisors' negligence for purposes of determining the proper civil penalties to be assessed against Capitol, the Commission's decision did not disturb the fact that, when determining the appropriate civil penalties to be assessed against Capitol, the administrative judge took into account the "responsible training program" Capitol had in place prior to the incidents in this case, as well as Capitol's safety rules and hiring practices. (See J.A. at 413, 415, & 455).

Although the Commission refused to create a blanket exception to the general rule that the actions of the operator's agents are imputable to the operator for purposes of an unwarrantable failure finding, an operator's training programs, safety rules, and hiring practices may still be taken into account to mitigate the civil penalty assessed for an unwarrantable failure violation. Thus, the refusal on the part of the Commission to create an exception to the general rule that the actions of an operator's agents are imputable to the operator for purposes of an unwarrantable failure finding should not diminish the incentive for mine operators to train supervisors. Rather, the Commission's decision leaves in place a significant incentive for operators to select only

10

qualified supervisors and to provide each supervisor with comprehensive training, thereby promoting the health and safety of all miners.

In light of the language, the structure, and the purpose of the Mine Act, we find that the Commission's interpretation and application of the Mine Act is reasonable. Accordingly, despite Capitol's good faith attempts to comply with the Mine Act, the Commission did not err in imputing the misconduct of Bonfili and Lozano to Capitol for purposes of the unwarrantable failure findings. The decision of the Commission is

AFFIRMED.

11